Conrad SCHELLONG, Petitioner,

v.

U.S. IMMIGRATION AND NATURALI-ZATION SERVICE, Respondent.

No. 85–2430.

United States Court of Appeals,
Seventh Circuit.

Argued April 11, 1986.

Decided Oct. 15, 1986.

As Amended Oct. 20 and Nov. 3, 1986.

Rehearing Denied Nov. 14, 1986.

Charles W. Nixon, Chicago, Ill., for petitioner.

David M. Marblestone, Office of Special Investigation, Dept. of Justice, Washington, D.C., for respondent.

Before BAUER, Chief Judge, CUMMINGS and FLAUM, Circuit Judges.

CUMMINGS, Circuit Judge.

The petitioner, Conrad Schellong, contests a deportation order issued by the United States Immigration Court. Schellong was first denaturalized and later ordered deported for his activities in Nazi concentration camps in pre-war Germany. Two branches of litigation have brought this case before this Court. The first was a suit by the Office of Special Investigations (OSI) against Schellong to revoke his naturalized citizenship. The government was successful in denaturalizing Schellong as recorded in *United States v. Schellong*, 547 F.Supp. 569 (N.D.Ill.1982), affirmed by opinion, 717 F.2d 329 (7th Cir.1983), certiorari denied, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234. After obtaining its final order of denaturalization, the OSI proceeded to seek an order of deportation. An Immigration Judge granted that order on September 5, 1984. Schellong appealed to the Board of Immigration Appeals, which affirmed the decision of the Immigration Judge on July 11, 1985. Schellong then petitioned this Court for review.

Schellong was denaturalized under 8 U.S.C. § 1451(a) as having procured his certificate of naturalization by concealment of a material fact or by willful misrepresentation. 717 F.2d at 334. This determination was made because of misleading representations on Schellong's visa application and naturalization petition. Because the facts initially determined in the denaturalization litigation are central to the controversy in the case before us, we will quickly summarize those facts. See 547 F.Supp. at 570–574; 717 F.2d at 331–333.

I. *Statement of Facts*

Schellong was born in Germany in 1910. In 1932 he joined a branch of the Nazi Party known as the Storm Troopers. He then entered the *Schutzstaffel* (SS), which provided protective and intelligence services for the Nazi Party. Adolf Hitler came into power in 1933, and Schellong remained a member of the Nazi Party until Hitler's fall in 1945.

In February 1934, Schellong joined the SS *Sonderkommando* (Special Commando) "*Sachsen*." The members of this organization were assigned to administrative and guard duties at the Sachsenburg Concentration Camp in Saxony, Germany. The SS Special Commando "*Sachsen*" were separate from the camp commandant's staff, which supervised the daily operation of the camp. During this time the SS was a Nazi Party organization; it had no military responsibilities. As a corporal at Sachsenburg, Schellong supervised a platoon of guards and served as a Security Officer and a Reserve Officer on a rotating basis. As such, Schellong was in charge of security for the camp for 24–hour periods.

In early 1936 Schellong was temporarily assigned to the SS Guard Unit "*Oberbayern*" at Dachau Concentration Camp near Dachau, Germany. There he took a platoon leaders' training course. When he returned to Sachsenburg he took command of 30 men who guarded the camp. These guards supervised the prisoners at work sites. The guards were instructed to warn and then shoot to kill any escaping prisoner. They were aware of the treatment given prisoners and of their work and liv-

ing conditions. As a rotating Security Officer, Schellong was in charge of security for the entire camp for 24-hour shifts.

Late in 1936 petitioner was transferred to the Dachau Concentration Camp and assigned to the Seventh Company of the Death's Head Unit *"Oberbayern."* Between 1936 and 1939 Schellong commanded several units, all of which performed guard duty at the camp. Schellong trained new recruits and performed other administrative tasks necessary to the supervision of the guards under his command. These guards watched the prisoners on work detail, manned the watchtowers, and generally maintained order in the camp. Schellong was eventually promoted to Captain during his tenure at Dachau.

There was no evidence presented in the denaturalization case that Schellong personally engaged in physical abuse of the prisoners. He did admit, however, that he was aware of the treatment of the prisoners at Dachau—the forced labor, the living conditions, and the arbitrary punishment.

In late 1939 the various Death's Head Units were consolidated into a single military organization that was part of the German Armed Forces. This military organization was called the *Waffen SS,* or "Armed SS." Schellong remained with the Death's Head Regiment of the *Waffen SS* in Norway until 1941. For the remainder of the war he served on the eastern front. By the end of the war he had attained the rank of Lieutenant Colonel.

In December 1956 Schellong filed an application for a visa. In response to a question asking applicants to list their previous places of residence, the petitioner responded:

"Birth–1911, Dresden, Germany; 1911–1934, Leipzwig, Germany; 1934–1939, German Waffen SS; 1939–1945, Waffen SS during the war, ..."

Schellong did not mention his two-year stay at Sachsenburg Concentration Camp or his three-year stay at Dachau Concentration Camp. He was granted a visa and entered the United States in 1957.

Five years later the petitioner filed an application to file a petition for naturalization with the Immigration and Naturalization Service (INS). Question 7 requested the applicant to list her or his memberships in "each organization, association, fund, foundation, club or society." Schellong answered:

| | |
|---|---|
| *Christlicher verein junger Maenner* [church organization] | 1920–1927 |
| *Leipziger Ballspiel club* [soccer club] | 1926–1932 |
| *National Sozialistische Arbeiter Partie* [Nazi Party] | 1932–1945 |
| *Allgemeine SS* [     ] elite corps | 1932–1934 |
| *Waffen SS* [     ] | 1934–1945 |
| Member of the Church of St. Luke [No others] | 1957-date |

Schellong did not include his association with the storm troopers in 1932, the *SS Sonderkommando "Sachsen,"* the *SS Wachverbande "Sachsen,"* the *SS Totenkopfverbande "Sachsen,"* or the *SS Totenkopfverbande "Oberbayern"* (Death's Head Unit).

During the processing of his naturalization petition Schellong was directed to provide an additional sworn statement concerning his activities between 1934 and 1939. As part of that statement, Schellong wrote, "The Waffen SS was a part of the German Army. I like to be soldier and I signed in 1934.... I had never to do any service in an concentration camp and never arrest one man in this matter. I was only soldier." Schellong's petition was granted and a certificate of naturalization issued on July 17, 1962.

The district court found that Schellong willfully concealed and misrepresented material facts in his visa and citizenship applications and so revoked his citizenship pursuant to 8 U.S.C. § 1451(a). *United States v. Schellong,* 547 F.Supp. 569, 574–575 (N.D.Ill.1982). This Court affirmed the findings of the district court and that revocation. 717 F.2d 329 (1984). In the subsequent deportation case, the Immigration Judge applied the doctrine of collateral estoppel to the facts found in the denaturalization case, and also conducted an inde-

pendent review of the evidence presented by the government, which was virtually the identical evidence presented in the denaturalization proceedings. The petitioner introduced additional evidence at the deportation hearing relating to the historical use of the term *"Waffen SS."* The Board of Immigration Appeals affirmed on the basis of collateral estoppel.

Schellong raises essentially three issues on appeal. First he argues that collateral estoppel is inappropriate for deportation cases and that it was incorrectly applied in this case. Second he argues that his activities at Sachsenburg and Dachau Concentration Camps do not rise to the level of persecution for purposes of the Holtzman Amendment. Third he contends that the Holtzman Amendment is unconstitutional as a bill of attainder or *ex post facto* law. For the reasons discussed below, we affirm the order of deportation.

## II. *Collateral Estoppel*

A. Schellong maintains that the doctrine of collateral estoppel should not be used in deportation cases, citing *Title v. INS*, 322 F.2d 21 (9th Cir.1963). In *Title* the Ninth Circuit reviewed an immigration order deporting an alien because of membership in the Communist Party. The immigration judge had denied Title's request to present evidence at the deportation hearing. All evidence relating to the alien's membership in the Communist Party was adduced by collateral estoppel. The Ninth Circuit ruled that the application of collateral estoppel denied the petitioner the hearing guaranteed by Section 242 of the Immigration and Naturalization Act, 8 U.S.C. § 1252(b). *Id.* at 24. The court additionally held that application of the doctrine against Title would work an injustice because the petitioner had not testified at the denaturalization hearing but wished to introduce evidence at the deportation hearing because of a change in the law regarding his Communist Party affiliation. *Id.* at 25. ▪ *Title* is distinguishable because the alien had presented no evidence at his denaturalization trial and despite a change

in the applicable law was not allowed to present evidence at his deportation hearing. Thus, to apply the doctrine of collateral estoppel would work an injustice. We disagree with the Ninth Circuit's holding if it rejects all applications of collateral estoppel in deportation hearings. Under collateral estoppel, once an issue is actually and necessarily decided by a court, that determination is conclusive in a subsequent suit on a different cause of action that involves a party to the earlier litigation. *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210. Collateral estoppel has been approved in 42 U.S.C. § 1983 cases, *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308, criminal cases, *United States v. Alexander*, 743 F.2d 472 (7th Cir.1984), to findings in previous deportation hearings, *United States v. Colacurcio*, 514 F.2d 1 (9th Cir.1975), and naturalization hearings, *Petition of Nisperos*, 471 F.Supp. 296 (C.D.Cal.1979). However, the doctrine is applied flexibly and will not bar relitigation of issues if, as in *Title*, the party against whom it operates did not have a full and fair opportunity to litigate the issues. *Montana*, 440 U.S. at 164 n. 11, 99 S.Ct. at 979 n. 11; *Lumen Construction, Inc. v. Brant Const. Co.*, 780 F.2d 691, 697 (7th Cir.1985). Additionally, a judgment which is based on alternative grounds is an effective adjudication as to both and is collaterally conclusive as to both. *Irving Nat'l Bank v. Law*, 10 F.2d 721, 724 (2d Cir.1926); 1B Moore's Federal Practice ¶ 0.443[5.–1 ], at 782.

▪ The right of aliens to a deportation hearing is adequately protected by the requirement that the alien was given a full and fair opportunity to litigate in the prior proceeding, as well as the other requirements for application of collateral estoppel: (1) identity of issues; (2) the issue be actually litigated and determined; (3) the issue be necessary to the judgment; and (4) the party against whom collateral estoppel operates was a party in the previous action. *County of Cook v. MidCon Corp.*, 773 F.2d 892, 898 (7th Cir.1985). As long as these factors are present and the doctrine's appli-

cation will not be unjust, collateral estoppel may be applied to deportation proceedings. Therefore, it is necessary to examine the facts established in the denaturalization suit against Schellong to see whether they are sufficient to meet the requirements for deportation under § 1251(a)(1) and (19).[1]

■ B. The petitioner contends that in the denaturalization proceeding the district court held only that he concealed material facts, not that he willfully misrepresented them. The essential elements for denaturalization differ from those for deportation. Denaturalization is permitted when the certificate and order of naturalization were procured by concealment of a material fact or by willful misrepresentation. 8 U.S.C. § 1451(a). In contrast, the deportation statute requires that the government prove misrepresentation or fraud, not concealment. 8 U.S.C. § 1251(a)(1). Because concealment is irrelevant for purposes of deportation, Schellong argues the issues in the two cases are not co-extensive and, therefore, the government has not met its burden.

Petitioner's argument is unpersuasive for two reasons. First, this Court and the district court based their holdings on both concealment and willful misrepresentation. This Court stated: "In light of these facts, the district court did not err in finding willful misrepresentation or concealment." 717 F.2d at 334. Likewise the district court refers to both issues in its opinion, e.g., "[i]n this case, the court finds that the misrepresentations and concealment were willful." 547 F.Supp. at 576. And when a court relies on alternative grounds for its decision, either of which are necessary to the judgment, both grounds are collaterally conclusive. See generally 1B Moore's Federal Practice ¶ 0.443[5.–1], at 782.

■ Alternatively, assuming that the district court held only that concealment was proven, the facts established (and necessary to the judgment) in the denaturalization suit sufficiently demonstrate that Schellong willfully misrepresented material facts on both his visa application and his naturalization petition. "[T]he doctrine of collateral estoppel can apply to preclude relitigation of both issues of law and issues of fact if those issues were conclusively determined in a prior action." *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 170–171, 104 S.Ct. 575, 578–579, 78 L.Ed.2d 388 (1984); *United States v. Mendoza*, 464 U.S. 154, 158, 104 S.Ct. 568, 571, 78 L.Ed.2d 379 (1984). On his visa application Schellong not only concealed his stays at the Sachsenburg and Dachau Concentration Camps, he wrote instead *"Waffen SS"* as his residence for that time period (1934–1939). Furthermore, on his petition for naturalization he again used the term *"Waffen SS"* and said it was a part of the German army. The district court ruled that the term *"Waffen SS"* was a misrepresentation designed to conceal his presence at the two concentration camps because the *Waffen SS* was not formed until 1939. 547 F.Supp. at 576. In so ruling the district court rejected Schellong's argument that *"Waffen SS"* was an umbrella term for all armed SS personnel.[2] Moreover, in his sworn statement on the petition for naturalization Schellong misrepresented that he had never served at a concentration camp; that was clearly false. *Id.* Each of these findings was upheld by this Court on appeal. 717 F.2d at 334.

1. Schellong claims that the bulk of the district court's findings in the denaturalization case were based on Rule 36 admissions. Thus, to apply collateral estoppel to those findings would violate Rule 36, which forbids use of the admissions in any other proceeding. However, defendant failed to raise this issue below and has thus waived it. *Gehl v. Commissioner*, 795 F.2d 1324 (7th Cir.1986). Additionally, the substance of the admissions—the number and nature of prisoners and the conditions of the concentra-

tion camps—was discussed by a number of witnesses.

2. Schellong also argues that his additional evidence introduced in the deportation hearing regarding the use of the term *"Waffen SS"* was ignored. However, collateral estoppel bars relitigation of whether there were misrepresentations on the visa and naturalization applications.

Schellong contends that this Court explicitly held that he made no misrepresentation on his visa application. Schellong refers to language in the opinion that reads: "If this case centered only around the visa application, we would be reluctant to uphold a finding of willful concealment or misrepresentation * * *. For all we know at this point, Schellong might have entered *'Waffen SS'* as a form of shorthand for his residences, fully intending to clarify the answer if given the opportunity to do so." However, we went on to say, "The visa application is not, however, the only alleged instance of willful misrepresentation or concealment," and then discussed the naturalization petition. Therefore, the Board of Immigration Appeals is correct that this Court decided that Schellong's later misrepresentations indicated the true nature of his answer on the visa application—he was, even then, attempting to mislead government authorities to gain entrance to the United States. In sum, the Board of Immigration Appeals did not err in relying on collateral estoppel to establish the requisite facts for deportation under § 1251(a)(1). See *United States v. Demjanjuk*, 767 F.2d 922 (6th Cir.1985).

C. Schellong also contends that the facts established in the denaturalization proceeding do not support a deportation order under the Holtzman Amendment, 8 U.S.C. § 1251(a)(19). That Section mandates deportation of any alien who:

during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with—

(A) the Nazi government of Germany,

B) any government in any area occupied by the military forces of the Nazi government of Germany,

(C) any government established with the assistance or cooperation of the Nazi government of Germany, or

(D) any government which was an ally of the Nazi government of Germany, ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion.

Schellong makes several arguments. First he asserts that the district court explicitly ruled that there was no evidence presented that he personally engaged in acts of persecution. As part of that argument, Schellong maintains that knowledge of persecution as well as personal active involvement in atrocities is required to show that he assisted the Nazis in persecuting civilians. Schellong further argues that the term "persecution" is both unconstitutionally vague and overbroad.

■ Section 1251(a)(19) is an additional independent ground of deportation. However, a deportation order under subsection (a)(19) is significant because Section 1254(a) disallows suspension of aliens described in Section 1251(a)(19). We agree with Schellong that both the district court and Court of Appeals explicitly noted that the evidence had not implicated him in any specific incidents of violence against the prisoners at either Sachsenburg or Dachau Concentration Camps. Therefore we must decide whether Schellong's service as a Nazi concentration camp guard alone is assistance "in the persecution of any person" for purposes of Section 1251(a)(19).[3]

In *United States v. Kairys*, 782 F.2d 1374, 1377 n. 3 (7th Cir.1986), certiorari denied, —— U.S. ——, 106 S.Ct. 2258, 90 L.Ed.2d 703, we held that service as a Nazi concentration camp guard equaled persecution of civilians for purposes of Section 2(b) of the Displaced Persons Act of 1948, 62 Stat. 1009, without proof of personal involvement in atrocities (interpreting *Fedorenko v. United States*, 449 U.S. 490, 512–513 n. 34, 101 S.Ct. 737, 750 n. 34, 66

---

**3.** Schellong also contends that a finding of persecution was not necessary to the judgment of denaturalization. All we need consider, however, is whether the finding that Schellong served as a concentration camp guard was necessary to the denaturalization judgment. Schellong's activities as a camp guard are what make

the misrepresentations and concealments "material" under § 1451(a). They are material because revelation of that fact would have rendered Schellong inadmissible under the Immigration and Nationality Act of 1952. *Fedorenko*, 449 U.S. at 507–514, 101 S.Ct. at 747–751; see also *United States v. Schellong*, 717 F.2d at 335.

L.Ed.2d 686). Schellong does not dispute that he served as a concentration camp guard at Sachsenburg and trained and supervised guards at Dachau. It is that criminal fact, conclusively established in the denaturalization proceeding, which may not be relitigated in the deportation proceedings by virtue of collateral estoppel.

Likewise, an individual who served as a guard has assisted in persecution for purposes of Section 1251(a)(19). The purposes of the two statutes were identical: to exclude from the United States individuals who along with the Nazis had inflicted suffering on persons because of their race, religion, or political opinion. The exception to the applicability of collateral estoppel for "unmixed questions of law" arising in "successive actions involving unrelated subject matter" does not apply here. See *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (citing *Montana*, 440 U.S. at 162, 99 S.Ct. at 978). Nazi concentration camps were places of persecution; individuals who, armed with guns, held the prisoners captive and prodded them into forced labor with threats of death or capital punishment cannot deny that they aided the Nazis in their program of racial, political, and religious oppression.

Schellong cites *Laipenieks v. INS*, 750 F.2d 1427 (9th Cir.1985), and *United States v. Sprogis*, 763 F.2d 115 (2d Cir.1985), as support for his position that an individual must have "actively" or "personally" participated in persecution. Insofar as these cases hold that personal involvement in atrocities is necessary to have assisted in persecution for purposes of the DPA or the Holtzman Amendment, they conflict with *Fedorenko*, 449 U.S. at 512 n. 34, 101 S.Ct. at n. 34. See 750 F.2d at 1432 and 763 F.2d at 122–123. In addition, the cases are factually distinguishable from the one before us. Neither defendant guarded prisoners at a concentration camp, rather both were local police officers not associated with the Nazi *SS*. See 750 F.2d at 1437; 763 F.2d at 122–123.

Schellong next argues that he had no knowledge of the persecution but rather believed that the prisoners were there either because they had broken German laws or for their own protection. We need not address the issue of whether Section 1251(a)(19) requires knowledge of the persecution in order to "assist" in the persecution. The facts established in the denaturalization proceeding negate Schellong's assertion that he did not know of the persecution. Schellong guarded prisoners who wore different colored arm bands to represent their "class," whether Jewish, clergy, or political opponents of the Nazi regime. He guarded prisoners on a rotating basis and supervised other guards for over 5 years. During that time he was promoted from corporal to captain. Furthermore, Schellong was at Dachau in November 1938 when the number of prisoners increased dramatically from 4,000 to 14,000. This increase was the result of *Kristallnacht*, a pogrom throughout Germany in which the Nazis destroyed synagogues and Jewish-owned homes and property, as well as arbitrarily arrested thousands of Jews. Schellong's assertion that he remained unaware of the persecutorial nature of the concentration camps is incredible.

Schellong distinguishes *Kairys* and *Fedorenko* on the ground that he served at Sachsenburg and Dachau in prewar Germany before these and other concentration camps became "death mills." We see no merit to this distinction. First, the language of Section 1251(a)(19) specifically includes the 1934–1939 time period. And the conditions (incarcerations, forced labor, cruel and inhuman treatment, arbitrary and severe punishment) were sufficient to rise to the level of persecution.

> The policy of persecution, repression and murder of civilians in Germany before the war of 1939, who were likely to be hostile to the Government, was most ruthlessly carried out. The persecution of Jews during the same period is established beyond all doubt.

*The Nurnberg Trial*, 6 F.R.D. 69, 131 (1946).

█ Finally, Schellong attacks Section 1251(a)(19), arguing that the term "perse-

cution" is overbroad and vague. This argument has no merit. Although the term is not defined in the Immigration and Nationality Act, it is explained in its legislative history. The House Judiciary Committee noted that in light of the "substantial body of precedent," there was no need to define the phrase "persecution because of race, religion, national origin or political opinion." H.R.Rep. No. 95–1452, 95th Cong., 2d Sess., at 6 (1978), U.S.Code Cong. & Admin.News 1978, at 4700, 4705. The precedent referred to by the Committee includes the Displaced Persons Act, the Refugee Relief Act of 1953, other provisions of the Immigration and Nationality Act (see §§ 1153(a)(7) and 1253(h)), international agreements, and opinions of the Nurnberg tribunals. *Id.* at 2–3, 4–7. According to the Committee, the general standard of persecution is "the infliction of suffering or harm, under government sanction, upon persons who differ in a way regarded as offensive (*e.g.*, race, religion, political opinion, etc.), in a manner condemned by civilized governments." *Id.* at 5, U.S.Code Cong. & Admin. News 1978, at 4704. The Ninth Circuit recently addressed this very issue in *Artukovic v. INS*, 693 F.2d 894, 896 (9th Cir.1982), and also held that the legislative history and court interpretations adequately defined persecution. We hold that Section 1251(a)(19) is not unconstitutionally vague or overbroad.

III. *Bill of Attainder and* Ex Post Facto

■ Schellong argues that both the Holtzman Amendment (8 U.S.C. § 1251(a)(19)) and Section 244(a) of the Immigration and Naturalization Act (8 U.S.C. § 1254(a)) are bills of attainder and operate as *ex post facto* laws in violation of the Constitution. U.S.Const. art. I, ¶ 9, cl. 3. Schellong argues that the purpose of both was to punish individuals involved in Nazi Germany. The Holtzman Amendment, Section 241(a)(19), was enacted in 1978. Pub.L. No. 95–549, 92 Stat. 2065 (codified at 8 U.S.C. § 1251(a)(19)). The provision making aliens who are deportable under Section 241(a)(19) ineligible for suspension of deportation was added in 1981. Pub.L.

No. 97–116, 95 Stat. 1616 (codified at 8 U.S.C. § 1254(a)).

A bill of attainder is a legislative act that inflicts punishment without a judicial trial. *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356; *Linnas v. INS*, 790 F.2d 1024, 1028 (2d Cir.1986). A bill of attainder "assumes * * * Judicial magistracy; it pronounces upon the guilt of the party, without any of the forms or safeguards of trial." *Cummings*, 71 U.S. (4 Wall.) at 323. An *ex post facto* law is one that makes certain actions or behaviors unlawful after the fact. The Holtzman Amendment, § 1251(a)(19), requires that persons who have participated in Nazi persecution from 1933 to 1939 be deported. Section 244(a) eliminates the Attorney General's power to grant such persons discretionary relief. Deportation is required even though the deportee's life or freedom is endangered.

The Second Circuit in *Linnas* recently held that the Holtzman Amendment and Section 244(a) of the Immigration and Nationality Act (§§ 1251(a)(19) and 1254(a)) did not constitute a bill of attainder. 790 F.2d at 1029–1030. The court reasoned that deportation (especially of non-citizens) has never been considered as punishment. *Artukovic v. INS*, 693 F.2d 894, 897 (9th Cir.1982), was consistent with *Linnas* and also addressed the *ex post facto* issue. *Artukovic* held that because deportation is not a punishment, the Holtzman Amendment did not violate the *ex post facto* and bill of attainder provisions in Art. I, Sec. 9 of the Constitution. The purpose of these statutes is not to punish individuals for actions previously taken, but to ensure that the United States is not a haven for individuals who assisted the Nazis in the brutal persecution and murder of millions of people. The Holtzman Amendment condemns the senseless genocide of Jews and other minority groups by refusing to harbor here those involved in the persecution. H.R. Rep. No. 1452, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad. News 4700. We agree with both the Second and Ninth Circuits that these statutory

provisions do not constitute bills of attainder, nor are they *ex post facto* laws.

## IV. *Conclusion*

For the reasons discussed above the decision of the Board of Immigration Appeals is affirmed.