Al DERRICKSON, et al., Plaintiffs,

v.

CITY OF DANVILLE, ILLINOIS, et al., Defendants–Appellees.

Appeal of STATE OF ILLINOIS, Wilbur T. Scharlau, Jerome D. Brown, Raymond T. Randall, Ernie Cox, and Wendell W. Wright, Real Parties in Interest–Appellees.

No. 87–2385.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 25, 1988.

Decided April 28, 1988.

As Amended June 29, 1988.

Craig H. DeArmond, State's Atty., James K. Borbely, Kurth, Wolgamot, Borbely, Danville, Ill., for plaintiffs.

Lawrence C. Dinardo, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendants-appellees.

Before CUDAHY, FLAUM and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

This case began as a suit under the Voting Rights Act, 42 U.S.C. §§ 1973–73bb–1, seeking an injunction against the at-large system used by the City of Danville, Illinois, to elect its municipal government. The City, its four elected Commissioners, and its corporate counsel (collectively the Commissioners) were among the defendants. Under the system then used in Danville, the Commissioners possessed both legislative and executive powers.

I

The plaintiffs and the Commissioners immediately began to negotiate and soon produced a draft consent decree providing for the election of a City Council from seven two-member districts, and a Mayor and Treasurer from the City at large. In this new system the Mayor would nominate, and the Council confirm or reject, the heads of the executive departments. The proposal was satisfactory to the plaintiffs. But it came at some cost to the Commissioners, who stood to lose their legislative offices and thereby their executive powers as well. They proposed to handle this with a clause that as finally revised provides:

For a period of three years from the date of the first general election held [under this decree], the current elected Commissioners shall continue in an [sic] office solely in an executive capacity as Administrators of the City Departments of Streets and Public Improvements, Accounts and Finance, Public Property, and Public Health and Safety. These Administrators shall not be members of the City Council and shall have no legislative responsibilities. These Department Heads may be removed for misfeasance or malfeasance of office. In order to remove a Department Head serving this three-year period, eight members of the Council must concur in the decision to remove him from office.

The plaintiffs were agreeable, but the Commissioners' proposed grant to themselves of tenure of office did not sit well with everyone in Danville.

The State's Attorney for Vermilion County, which comprises Danville, opened a criminal investigation, issuing subpoenaes for the Commissioners to appear before a grand jury. He expressed concern that the Commissioners' negotiation on behalf of the City for their own future jobs as individuals violated the state's conflict-of-interest law, Ill.Rev.Stat. ch. 24 § 3–14–4(a), and provisions of the municipal code. This caused unease among the Commissioners, and the plaintiffs (who did not want the Commissioners spooked into abandoning the negotiations) asked the district judge to add the State's Attorney as a party and enjoin the investigation. The district judge did so pending a hearing on the propriety of the consent decree. The district court also enjoined the holding of the municipal elections, scheduled for February 24, 1987.

The district court held a hearing on the proposed decree on February 20 and 25, entertaining objections from many persons to its content (including the three-year terms and the possibility that the existing

Commissioners would set their own salaries as Department Heads). At the conclusion of the hearing the court approved and entered the decree, finding that "the proposed decree is fair, adequate, and reasonable and that it does not violate state or federal law." The judge thought the grant of three years' tenure removed an obstacle to the decree: but for it, the Commissioners might have fought tooth and nail to protect their positions and might have succeeded in hanging onto them for more than three years (especially so if elections could not be held!), all the while frustrating the plaintiffs' demands for relief and running up huge legal bills on the City's tab. The self-interested acts of the Commissioners thus had both good and bad qualities, and the court believed that the good predominated. On approving the decree the court dissolved the injunction against the State's Attorney. No one appealed from the order approving the decree.

The State's Attorney then presented his case to the grand jury, which returned an eight-count indictment against the Commissioners and corporate counsel. Their worst fears realized, the Commissioners returned to the district court, filing a motion in the Voting Rights Act case requesting the court to "effectuate" its judgment. On July 28, 1987, Judge Mills granted a preliminary injunction against the state prosecution, and on August 27 Judge Baker, who had approved the consent decree, converted it into a permanent injunction, adopting the opinion of Judge Mills without rereading the proceedings of February. (Judge Baker remarked: "I don't know what the record says verbatim in the proceedings of February 25th, and that record will speak for itself.")

Judge Mills, in the opinion adopted by Judge Baker, concluded that Judge Baker's statement that the decree is consistent with state law resolved the question the State's Attorney had raised in the criminal case, and that an injunction is both necessary to protect the court's decree and authorized— despite *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)—by the relitigation exception to the Anti-Injunction Act, 28 U.S.C. § 2283. (The opinion may depend on the suppressed assumption that anything not forbidden by the Anti–Injunction Act is authorized, an assumption the City questions but which, for reasons developed below, we do not reach.) Judge Mills also relied on *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 238, 104 S.Ct. 2321, 2328, 81 L.Ed.2d 186 (1983), for the proposition that *Younger* requires abstention only to the extent the state proceedings gets underway before the federal case; here, Judge Mills pointed out, the federal case was over before the state case began. Because Judge Baker had resolved the central question in the state case, Judge Mills concluded, the State's Attorney could not relitigate the matter in the guise of a criminal proceeding. The State's Attorney appeals.

## II

This case illustrates a potential problem of consent decrees: the divergence of interest between those who negotiate the decree and the people they represent. See Geoffrey P. Miller, *Some Agency Problems in Settlement*, 16 J. Legal Studies 189 (1987). Today's agents may be tempted to do by "consent" what federal law does not require or state law permit. See, e.g., Douglas Laycock, *Consent Decrees Without Consent: The Rights of Nonconsenting Third Parties*, 1987 U.Chi.Legal Forum 103; Michael W. McConnell, *Why Hold Elections? Using Consent Decrees to Insulate Policies from Political Change, id.* at 295; and other articles in that symposium issue. Officeholders may try to bind their successors to policies that they could not otherwise protect beyond their tenures. See *Alliance to End Repression v. City of Chicago*, 742 F.2d 1007, 1014–15 (7th Cir. 1984) (en banc). Here officeholders have prolonged their tenures directly. The Commissioners were to stand for reelection on February 24, 1987, and could have been turned out; instead they signed and the court approved a decree ensuring their status as Department Heads until mid-1990.

If the State's Attorney had been a stranger to the consent decree, there would have been no obstacle to the criminal prose-

cution. He wields the authority of the State of Illinois, and the City of Danville may not contract away the prosecutorial power of the State. We held in *Dunn v. Carey*, 808 F.2d 555 (7th Cir.1986), that a consent decree is fundamentally a contract and therefore does not bind a governmental body to any greater degree than a contract.

Because a consent decree's force comes from agreement rather than positive law, the decree depends on the parties' authority to give assent. A party who settles a dispute but lacks such authority may withdraw the assent, we concluded in *Morgan* [*v. South Bend Community School Corp.*, 797 F.2d 471, 477–78 (7th Cir.1986).] Third parties, not even colorably bound by the decree, also should be able to challenge the authority of the person assenting to the decree. [Citations omitted.] Some rules of law are designed to limit the authority of public officeholders, to make them return to other branches of government or to the voters for permission to engage in certain acts. They may chafe at these restraints and seek to evade them; if they do, the people for whose protection the restraints were created are entitled to repair to the forums designed to hear arguments that officeholders have acted without authority.

*Id.* at 559–60. See also *Kasper v. Board of Election Commissioners*, 814 F.2d 332, 341–42 (7th Cir.1987) ("A consent decree is not a method by which state agencies may liberate themselves from the statutes enacted by the legislature that created them. The Commissioners are agents, not principals; they need their principals' approval to alter the terms of the agency."); *National Revenue Corp. v. Violet*, 807 F.2d 285 (1st Cir.1986). We concluded in *Dunn* that taxpayers aggrieved by a decree committing the government to spend money may seek in state court an injunction against the expenditure, even though success in this quest could frustrate implementation of the federal decree. The State's Attorney does not want a state court to forbid compliance with the decree; he simply wants to apply the penalties that (the grand jury believes) attach to unauthorized methods of negotiating contracts. Judge Baker plainly thought that the good effects of the Commissioners' self-interested conduct (what would be called in corporate law "interest-alignment devices") outweighed the bad, but a state may decide for itself the appropriate balance of self-interest and self-abnegation in government. A state could forbid the Commissioners' decision to assure their "public-spiritedness" by paying themselves off in cash from the City Treasury, even if a district judge should conclude that payment would expedite the conclusion of the litigation. The propriety of the state proceedings seems to follow from *Dunn*, a case neither Judge Mills nor Judge Baker cited.

They relied instead on *Swann v. Charlotte–Mecklenburg Board of Education*, 501 F.2d 383 (4th Cir.1974) (en banc). *Swann* held that a district court may enjoin a private, civil suit in state court in which the plaintiff seeks an injunction compelling the government to disregard the federal court's decree. The State's Attorney does not seek an order compelling anyone to disobey the decree in this case. Resignation would not be "disobedience." More importantly, however, the judgment in *Swann* was not a consent decree. *Swann* was a fully-litigated case, and the Supreme Court had held that the terms of the decree were required by the Constitution to extirpate the vestiges of racial discrimination, see *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). State law was not going to stand in the way of the Supreme Court's decision. No court has held that Danville's form of government was unconstitutional or even illegal; this case was settled, not litigated. We held in *Dunn* that because the force of a consent decree comes from the agreement of the parties rather than the command of federal law, collateral inquiry into the authority of the negotiators to bind their principal is permissible. *Swann* does not speak to this subject and does not support the injunction.

The plaintiffs in the state proceedings in *Dunn*, however, had not been parties to

the federal case. They were accordingly not bound by any doctrines of preclusion—either issue preclusion (collateral estoppel) on the ground that the court had resolved the question of authority, or claim preclusion (res judicata) on the ground that they had bypassed an opportunity to litigate in federal court the question they wanted to raise in state court. The State's Attorney was a party to this federal case—involuntarily, but a party nonetheless. The decree was the settlement of a class action, so the district court held a hearing under Fed.R. Civ.P. 23(e) and decided against the objections that had been advanced. And the district judge said in open court on February 25 that the consent decree comported with state law. The State's Attorney could have appealed but did not. So, it seems, the case still has a clear outcome: having lost on the merits a piece of litigation to which both he and the Commissioners were parties, the State's Attorney may not try again in state court. If he does the district court may enjoin him in order to effectuate its judgment.

The State's Attorney tries to get out of this box with several lines of argument. Two deserve short shrift. The first is that only the State's Attorney personally was a party to the proceedings approving the consent decree, while the injunction runs against the State of Illinois. This neglects the point that the State's Attorney was a party in his official capacity, and an official-capacity suit is against the sovereign the official represents. *Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed. 2d 114 (1985). The second is that the Commissioners are parties to the case only in their official capacities, so they cannot take advantage of the consent decree to save their personal skins. This neglects the fact that the Commissioners became parties in (personal) interest when the consent decree gave them personal rights. It did more than establish a new governmental structure; it gave the Commissioners enforceable rights to hold office for three years. So both the State of Illinois and the former Commissioners were parties to the consent decree proceedings and are bound by the results—to the extent principles of preclu-

sion make these results binding, an important qualification that we develop below.

■ We clear away yet a third line of argument, this one advanced by the City. In the district court the City supported the Commissioners. On appeal—the election apparently having been held in the interim—the City filed a brief supporting the State's Attorney. The City did not file a notice of appeal against the ex-Commissioners, and it filed its brief at the same time as the ex-Commissioners. Imagine the shock of the Department Heads at discovering that the City not only had switched sides but also was advancing a line of argument not included in the State's Attorney's brief. The City's brief maintains that even if the district court fully adjudicated the issues of state law in February 1987, even if *Younger* is inapplicable, this is still not the kind of case in which a court may issue an injunction to protect or effectuate its judgments. Lacking any opportunity to respond to this brief, the ex-Commissioners filed a motion to strike it. We grant this motion.

The Department Heads contend that the City had to file a separate notice of appeal in order to invoke the jurisdiction of this court to hear its independent argument. Yet the City did not request any modification of the judgment beyond what the State's Attorney had called for. The State's Attorney's notice of appeal provided this court with jurisdiction to reverse the district court's judgment; the City is not asking us to enlarge its own rights at anyone's expense; nothing more is necessary. See Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, 15 *Federal Practice and Procedure* § 3904 (1976). The Supreme Court frequently modifies judgments at the request of appellees and respondents, something it could not do if each dissatisfied party must file its own appeal or petition for certiorari. E.g., *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 783–84 n. 14, 100 S.Ct. 2467, 2474 n. 14, 65 L.Ed.2d 506 (1980); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 266 n. 2, 104 S.Ct. 3049, 3052 n. 2, 82 L.Ed.2d 200 (1984).

There are still problems. The Federal Rules of Appellate Procedure do not prescribe the appropriate treatment of parties who do not appeal and are not otherwise the subject of requests for relief. Are they "appellees" or do they just vanish from the case? If they vanish (on the ground that the notice of appeal did not put their rights in issue), then they cannot file briefs asking for anything. If they do not vanish and want to line up with the appellants, when must they file their briefs? The Rules of the Supreme Court handle this problem expressly. Every non-appellant is an appellee, Rule 10.4, but any party may suggest that an appellee lacks a continuing interest in the case. If the party concedes or the Court finds that there is no continuing interest, the appellee will be dismissed. The rule continues: "any appellee who supports the position of an appellant shall meet the time schedule for filing papers which is provided for that appellant". This ensures that the "real" appellees are able to respond to the arguments for reversal—which they can't if the "appealing appellee" files with the "defending appellee". Although nothing in the Rules of Appellate Procedure directly parallels Supreme Court Rule 10.4, the principle that a party must give its adversaries an opportunity to respond to its arguments is so well understood at the bar that lawyers in the court of appeals must follow the approach of Rule 10.4 or have a very good reason why not. The City has advanced no reason for filing at the same time as the Department Heads.

There is, moreover, a second problem with the City's brief. So far as we can tell, no one made in the district court the argument the City now presses. This is a significant omission, because the City's argument has potentially large effects. A federal court may issue an injunction to protect or effectuate its judgments only to the extent the state court is bound to obey them. Several opinions in *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), raised but did not resolve the question whether a state court in a criminal case is bound by a declaration of law by a federal court. Many states accord less preclusive effect in criminal litigation to prior judgments than they do in civil cases, and perhaps if they disregard the judgments of their own courts they may do the same for the civil judgments of federal courts. Neither the Full Faith and Credit Clause of the Constitution nor the Full Faith and Credit statute, 28 U.S.C. § 1738, governs the effect of federal judgments in state courts. The Supreme Court still has not settled that issue, and we are reluctant to barge into this sensitive subject, which has not been adequately ventilated in the district court or here. We therefore strike the City's brief and decide the case solely on the remaining arguments of the State's Attorney.

### III

■ The State's Attorney advances three principal arguments: (1) That *Younger* precludes injunctive relief, given the holding of *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975) (a federal court should not enjoin a state prosecution begun before significant proceedings in the federal case). The district court did not begin to consider whether the consent decree complies with state law until after enjoining the State's Attorney from convening a grand jury, and the State's Attorney urges us to hold that *Hicks* rather than *Midkiff* applies when the state case could have gotten underway prior to the federal decision, but for a federal injunction nipping the state's inquiry in the bud. (2) That the injunction is not "necessary" to protect or effectuate the federal judgment and therefore does not fall within the relitigation exception to the Anti–Injunction Act, because the criminal proceedings do not threaten to undo any portion of the consent decree. They would not convert Danville back to a commission form of government, redraw any district boundaries, or abolish the tenure of office of the ex-Commissioners. (Mayor Curley of Boston showed that one can run a city from jail; anyway, the resignation of a Department Head would not change or violate the decree.) The Department Heads reply that this is an ex post perspective; had they

known in advance that the decree would lead them to the dock, they would not have negotiated it and the City would not have received its benefits. (3) That the proceedings leading to the approval of the decree do not bind under ordinary principles of preclusion. We agree with this third line of argument and so do not consider the others.

The State of Illinois could be bound by the disposition of February either because the State's Attorney had to raise an issue but neglected to do so (claim preclusion or res judicata) or because the district court actually decided the central issue in the state criminal prosecution (issue preclusion or collateral estoppel). Claim preclusion need not detain us. The State's Attorney, as a defendant, needed to raise his contentions only to the extent they amounted to a compulsory counterclaim under Fed.R.Civ. P. 13(a). A state criminal prosecution is not a compulsory counterclaim in a federal civil suit, not least because the forum lacks the jurisdiction to try the criminal case. The criminal prosecution also did not grow out of the same "transaction or occurrence" as the Voting Rights Act claim. Moreover, we have it on the highest authority that a governmental employee's lack of power to bind the sovereign, overlooked in negotiating a settlement, may be raised later on. *United States v. Beebe,* 180 U.S. 343, 351–55, 21 S.Ct. 371, 374–76, 45 L.Ed. 563 (1901); *Stone v. Bank of Commerce,* 174 U.S. 412, 19 S.Ct. 747, 43 L.Ed. 1028 (1899); see also *United States v. Newport News Shipbuilding & Dry Dock Co.,* 571 F.2d 1283, 1287 (4th Cir. 1978). To the extent *Delaware Valley Citizens' Council v. Pennsylvania,* 755 F.2d 38 (3d Cir.1985), takes a different view, our court has declined to follow it, see *Morgan v. South Bend Community School Corp.,* 797 F.2d 471, 477–78 (7th Cir.1986), for *Delaware Valley* neglected *Beebe* and *Stone.*

The State of Illinois therefore is bound only to the extent questions of authority were litigated and decided. Issue preclusion applies when an issue (a) was actually decided, (b) after a full and fair opportunity to litigate, and (c) was necessary to the

decision. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Schellong v. INS,* 805 F.2d 655, 658–59 (7th Cir.1986); *United States v. Ryan,* 810 F.2d 650, 654 (7th Cir.1987); *Restatement (Second) of Judgments* § 27 (1980). None of these criteria is satisfied here, for two reasons: (1) the district court severely limited the State's Attorney's participation in the case, and (2) the court needed to, and did, decide only whether the Danville government as an entity had the power to *enter into* the decree; it did not need to, and did not, decide whether the Commissioners were the right parties to *negotiate* on behalf of the City with themselves as jobseekers. This is a difference the State's Attorney stressed at the hearing, which the district court recognized at the time, but which the court overlooked when issuing the injunction.

Let us start with the opportunity to litigate. There was no discovery in the federal case, and the district court enjoined the grand jury's subpoenas, so the State's Attorney was unable to investigate the process of negotiating the decree. He was therefore unable to litigate whether the Commissioners violated state law during the negotiations. The district court was not the right forum for litigating a criminal case; the State's Attorney was understandably reluctant to try to prove that a crime had occurred when the grand jury had yet to hear evidence and he therefore could do no more than express concern about possible violations.

One of the private intervenors who objected to the consent decree at the hearing of February 25 attempted to raise the prosecutor's concern. This colloquy ensued:

MR. MEYER [counsel for Mr. Mellen]: Are we going to have an opportunity to call our own witnesses, have discovery, et cetera?

THE COURT: No.

MR. MEYER: Could I have a moment?

THE COURT: I say that abruptly, Mr. Meyer, because it is quite clear from the cases that consideration of a consent de-

cree should not degenerate into a trial on the merits.

. . . .

MR. MEYER: Your Honor, I would then—it appears to me, then, that our status here—

THE COURT: What do you want to do?

MR. MEYER: I don't want to be bound by this proceeding when I go to State Court. And if I'm going to be bound... I would like to have a full hearing. . . .

THE COURT: As a general principle, I don't suppose what any Federal Court says in state law generates a binding conclusion. . . . What Illinois says, its own law, isn't going to be determined by a Federal Court.

A few minutes later the prosecutor referred to this exchange in an effort to clarify his own position. The district court invited the State's Attorney (Mr. DeArmond) to make a presentation. This discussion took place:

MR. DE ARMOND: What is important for me to understand ... is there is an effort ... to inject into this record the appearance that I would be provided a full opportunity to basically conduct a criminal trial before this Court.

THE COURT: You will not. . . . That will be perfectly clear. You certainly will not. And it is no intention of the Court in any way to present [sic] you ultimately from pursuing the discharge of the duties of your office. . . .

MR. DE ARMOND: Yes, sir. And as I understand it, since Mr. Mellen's position would not even allow him discovery and the calling of witnesses, since my part in this is even less, that opportunity would not have been provided to me, anyway.

THE COURT: No, I'm not going to let you litigate the merits.

Counsel for the Commissioners inquired further along these lines, prompting the judge to say: "He [the State's Attorney] doesn't have the opportunity to conduct any full-scale investigation or litigation. . . .

I'm not going to try the case on the merits."

The district judge made it as plain as he knew how that he would not permit discovery or admit evidence—or even allow extended argument—about the application of state law to the negotiation of this decree. Having been told that he couldn't litigate the issue even if he wanted to (which he didn't), the State's Attorney did not have the "full and fair opportunity" that is the foundation for any application of issue preclusion.

The judge felt free to limit the presentation because he had said from the beginning that the State's Attorney would not be bound by the disposition at the hearing. Here are two of the many expressions along these lines:

[I]f I approve the decree, I'll forthwith dissolve the injunction against [the State's Attorney], because there is no purpose in having an injunction of that sort any longer, and he's free to pursue whatever paths he wishes as the duly elected prosecutor of Vermilion County, Illinois. And the defendants are going to have to defend against that and take their chances.

I really doubt, I have grave doubt that a settlement would be—could set aside criminal prosecutions. What's a crime under state law, in this context? But then, again, why should I be concerned? Why should this Court be concerned about that? My interest is in settling the litigation and to get the City of Danville off on a form of government that will remove denial or abridgement of the right to vote. . . . [Once] I have a final decree, Mr. DeArmond is at liberty to do whatever he chooses, within the bounds of Illinois law, I suppose.

A prosecutor hearing such statements would not think it necessary to present his case—even if the district court would have let him.

Nonetheless, at the close of the hearing on February 25 the district court read into the record an opinion, part of which declared that the decree did not violate state law. The district court addressed the

state-law question by saying that the statute and cases on the subject "did not deal with municipal officers settling complex and extravagantly expensive civil rights litigation" and so are inapplicable. It continued:

> [T]he defendants, aside from avoiding years of turmoil, have saved the city the crippling expense of the litigation and diminished the cost of salaries for the administrative officers. The city, had the litigation continued, would have paid commissioners' salaries for at least four and probably five or more years. The defendants did not violate their fiduciary relationship to the city or secure a personal advantage in conflict with their duty to serve the city.... If the Illinois statutes are in conflict with the settlement, and I conclude they are not, then the state statutes should give way to the policy of the federal law. I conclude that the proposed decree is fair, adequate, and reasonable and that it does not violate state or federal law.

This goes a good deal farther than the court had led the State's Attorney to believe.

There are two ways to read this language. One is that the *terms* of the decree are lawful—this is, that a municipality in Illinois may give executive officials contracts granting them the right to hold offices for a period of years—and beneficial to the City. If that is all the court held, then the finding poses no obstacle to the state's criminal prosecution, for the indictment challenges the manner of negotiation and not the terms of the decree. The court on this view did not actually decide any issue in the criminal prosecution.

The other way to read the statement is that the district court approved the manner of negotiation—that is, found it lawful in Illinois for public officials to stand on both sides of the negotiation. If that is what the court thought, the finding is unnecessary to the judgment. The court had to find that the decree comported with state law (see *Dunn* and *Kasper*); the absence of adjudication on the merits meant that the court could not declare the state law preempted (and despite some loose language the court did not do so). But the City was itself a party to the case, and the Commissioners were the City's legislative body at the time. They therefore could commit the City to the substance of this decree. None of the parties doubts that the decree is *binding*, even if a crime was committed in the course of its negotiation. And none doubts that a decree with these terms could have been negotiated without raising a question under state law. If, for example, the Commissioners had removed themselves from the process of negotiation, there would have been no serious question about either process or substance. As the district court approached its task, it had no reason to approve the manner of the decree's negotiation or pass on the identity of the persons who represented the City in the bargaining. We think this short-circuited things. It is not wise to approve a consent decree if a crime has been committed. As the concurring opinion soundly observes, "a consent decree purchased at such a price should not be accepted, regardless of other benefits it may provide." A court ought to avoid approving a decree negotiated by illegal means—it ought to resolve on the merits all issues necessary to ensure that the decree is a lawful, binding obligation of the persons who agree to it. The district court saw its task otherwise, however, which means that it did not in fact resolve the lawfulness of the negotiating process. Without such a resolution, it could not enjoin the state proceedings. *Chick Kam Choo v. Exxon Corp.*, — U.S. —, 108 S.Ct. 1684, 1690, 100 L.Ed.2d 127 (1988).

There is therefore no authoritative finding to be protected by an injunction against the state prosecution. The district court probably did not mean to approve the manner of negotiation (as opposed to the substance and binding quality) of the decree; to the extent it approved the manner of negotiation, that approval was not essential to the judgment; and even if the subject was essential to the judgment, the district court did not offer the State's Attorney a full and fair opportunity to litigate the subject. There is no basis for an injunction, and the judgment is

Reversed.

CUDAHY, Circuit Judge, concurring:

With important reservations and qualifications, I accept and join in the majority's analysis and result—at least on its own terms as a more or less limited exercise in the law of preclusion. Because of the case's strangely contorted history, the majority's holding seems justifiable—even if regrettable. For the state's attorney sought to raise his legitimate concerns in the district court, but Judge Baker, at least at first, thought that forum inappropriate for determination of these questions of state criminal law. Only later did he apparently change course and attempt to lay state law concerns to rest. Hence the state's attorney could not litigate his claims in the district court and he is not now precluded from pursuing state criminal prosecutions. I must, however, write separately to indicate my profound disagreement with any possible implication that there is anything "normal" or "appropriate" about what seems to me an ominous turn of events in the ongoing enforcement of the Voting Rights Act.

The Voting Rights Act was originally enacted in 1965—as a sequel to the celebrated march across the bridge in Selma, Alabama—because it was generally believed that the states could not be relied upon to enforce the guarantees of the fourteenth and fifteenth amendments with respect to the right of minorities to vote. If anything was ever intended as an overpowering act of federal supremacy, it was the Voting Rights Act—and the Act was renewed in 1982 in the same spirit. Perhaps no other piece of federal legislation has ever had such a profound impact on the electoral process in our country. Nor has any other measure by any government at any level had a greater effect in enfranchising the disenfranchised.

By today's decision we put our stamp of approval on a situation in which a federal court has approved a consent decree ending an at-large system of city government and substituting a system more hospitable to minorities. At the same time, however, we give the State of Illinois a green light to prosecute under Illinois criminal statutes the governmental figures who negotiated the settlement. I must emphasize that this result follows only from this case's unique facts and does not reflect any lack of authority in the federal courts in proper circumstances to insulate officials from prosecution for their negotiation of voting rights settlements. If the majority opinion were to be read broadly, I could think of nothing with a greater potential for impeding future enforcement of the Act. The Voting Rights Act's strong invocation of federal supremacy would be virtually nullified if the federal courts could not even protect negotiators from state prosecution.

The majority makes a plausible distinction between the unquestionable validity of the consent decree and the putatively criminal means employed in its negotiation. Thus the decree lives on and the electoral process becomes a mite fairer, but the indispensable parties to the settlement may languish in jail for their part in the proceedings. This may make sense to those inured to the contradictions of the law, but it makes precious little practical sense in the ongoing business of protecting and extending the franchise.

It seems to me that either consent decrees must address and resolve all state law problems, including the lawfulness of the *means* of settlement, or there should be no consent decrees. Here it appears that Judge Baker came around to this view at the end—although not soon enough to meet in all aspects the stringent demands of collateral estoppel. The state's attorney is doing his duty as he sees it, but in a way that may have a chilling effect on future voting rights settlements.[1] I can imagine a scenario like the one before us transposed to other locales where there might be more deep-rooted resistance to minority voting rights than in Danville.

It may be entirely wrong (and a crime) for city officials to extend their own tenure as part of a voting rights settlement. If this is the case, a consent decree purchased at such a price should not be accepted, regardless of other benefits it may provide.

1. Certainly I do not blame the state's attorney for these unfortunate consequences. As I have noted, the state's attorney tried to raise his concerns in the district court and was repeatedly— and incorrectly—told that those concerns were not the business of the federal court.

Not only the end but the means are the concern of the federal court and must be conclusively adjudicated by that court. Under no circumstances should the federal court approve a consent decree and then stand idly by while those who helped provide the benefits of the decree go to jail. To say the consent decree stands but those who did the consenting go to prison may be acceptable preclusion law in this case. But it is also the height of hypocrisy and, if not drastically limited, might be the beginning of the end of effective enforcement of the Voting Rights Act.

