THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILBUR SCHARLAU, Defendant (Ernie A. Cox *et al.*, Defendants-Appellants).

Fourth District No. 4—89—0300

Opinion filed January 4, 1990.

Matthias A. Lydon, of Lydon & Griffin, of Chicago, and Everett L. Laury, of Hutton, Laury, Hesser & Lietz, and M. Eugene Wright, both of Danville, for appellants.

Craig H. DeArmond, State's Attorney, of Danville, for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

The genesis of this appeal is the settlement of a lawsuit brought pursuant to the Voting Rights Act of 1965 (42 U.S.C. §1973b (1982 & Supp. V 1987)) (Voting Rights Case). The Voting Rights Case involved an allegation that the City of Danville's election practices diluted minority vote. Almost immediately after the voting rights complaint was

filed in Federal court, the city commissioners for Danville (Commissioners) and the city's corporate counsel, defendants, began negotiating a settlement. During the salient times involved in the instant case, the Danville city council consisted of the Commissioners. The mayor had resigned. Wilbur Scharlau, the finance commissioner, was acting mayor. On February 25, 1987, the Federal court approved the settlement proposal and entered a consent decree. The settlement changed the form of Danville's municipal government from a mayor-commissioner system to a mayor-alderman system. It eliminated city-wide elections. However, as part of the settlement, the Commissioners were to be retained as nonelected department heads for three years.

On July 17, 1987, indictments issued alleging that during the negotiation process, the Commissioners and their corporate counsel conspired to and did violate conflict-of-interest statutes by providing for their continuation as administrators of various departments. On December 12, 1988, a superseding indictment was filed. (Ill. Rev. Stat. 1987, ch. 24, par. 3—14—4(a); Ill. Rev. Stat. 1987, ch. 102, par. 3(a); Ill. Rev. Stat. 1987, ch. 38, par. 33—3(c).) On February 17, 1989, the trial court found the State had proved the allegations of counts I, II, III, IV, V, VI, and VIII beyond a reasonable doubt. It found Wright was not guilty of official misconduct as alleged in count VII. Subsequently, the court entered judgment against the Commissioners on count V, official misconduct (Ill. Rev. Stat. 1987, ch. 38, par. 33—3(c)), and the court entered judgment against Wright on count VI, official misconduct (Ill. Rev. Stat. 1987, ch. 38, par. 33—3(c)). The court sentenced the Commissioners to two years' conditional discharge and fined them each $1,000. The court sentenced Wright to two years' conditional discharge, 90 days in jail, and fined him $5,000.

Defendants appeal, arguing neither section 3—14—4(a) of the Illinois Municipal Code (Municipal Code) (Ill. Rev. Stat. 1987, ch. 24, par. 3—14—4(a)), section 3(a) of the Corrupt Practices Act (Ill. Rev. Stat. 1987, ch. 102, par. 3(a)), nor section 33—3(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 33—3(c)) applies in the instant fact situation. Defendants also argue legislative immunity prohibits any criminal prosecution. Finally, they contend reliance is an available defense to any allegation of a conflict of interest.

We reverse.

The facts relevant to this matter will be summarized as briefly as possible as defendants do not contest the sufficiency of the evidence.

PROCEDURAL BACKGROUND

An eight-count indictment issued alleging the Commissioners for

the City of Danville and their corporate counsel, Wendell Wright, had committed several offenses in the process of negotiating the settlement of the Voting Rights Case.

In count I, the State alleged Wilbur Scharlau, Ernie Cox, Jerome Brown, and Raymond Randall (hereinafter the Commissioners) violated section 3—14—4(a) of the Municipal Code by knowingly entering into an agreement to settle the Voting Rights Case, which required that the Commissioners be guaranteed positions as department heads for a term of three years following the general election held after the resolution of the Voting Rights Case. The department head positions did not currently exist in Danville and could be eliminated after three years. Count I further alleged defendants had no right to guaranteed positions or payment for them. Therefore, negotiating guaranteed positions as part of conducting business for the city constituted direct pecuniary interest in violation of section 3—14—4(a) of the Municipal Code. Ill. Rev. Stat. 1987, ch. 24, par. 3—14—4(a).

In count II, the State alleged the Commissioners and Wendell Wright, with the intent to violate section 3—14—4(a) of the Municipal Code, knowingly agreed to require the retention of the Commissioners as stated in count I as a condition for settling the Voting Rights Case. The count further alleged the Commissioners, in furtherance of the conspiracy, authorized and directed Wright to negotiate the settlement and include terms on their behalf. The negotiations were made part of the final consent decree.

In count III, the State alleged defendants as elected or appointed officers entered an agreement regarding city business, the settlement, wherein the Commissioners had a personal direct interest. (Ill. Rev. Stat. 1987, ch. 102, par. 3(a).) In count IV, the State alleged all defendants conspired to commit a conflict of interest as alleged in count III. Ill. Rev. Stat. 1987, ch. 38, par. 8—2.

In count V, the State alleged the Commissioners committed official misconduct between December 14, 1986, and February 26, 1987, when they, as public officers, knowingly and with the intent to obtain a personal advantage, performed an act in excess of their lawful authority. The act alleged was the negotiation of the carryover provision which allegedly violated section 3—14—4(a) of the Municipal Code and section 3(a) of the Corrupt Practices Act (Ill. Rev. Stat. 1987, ch. 102, par. 3(a)). Ill. Rev. Stat. 1987, ch. 38, par. 33—3(c).

In count VI, the State alleged Wright, as a public employee, committed official misconduct when he knowingly and with the intent to obtain a personal advantage for others, performed acts in excess of his legal authority. (Ill. Rev. Stat. 1987, ch. 38, par. 33—3(c).) Count

VII alleged Wright committed official misconduct by performing acts which he knew he was forbidden by law to perform, negotiating the settlement with the transition provision. In count VIII, the State alleged the Commissioners committed conflict of interest by knowingly offering to take or receive directly, money and other things of value to influence their action in an official character. Ill. Rev. Stat. 1987, ch. 102, par. 3(a).

TRIAL EVIDENCE

On December 12, 1987, a bench trial began. The circuit court reviewed the file of the Federal proceedings and the transcripts of two grand jury proceedings which occurred during the investigation of the instant case. The parties stipulated that two Commissioners had retired and two were working as department heads at the time of the trial.

FEDERAL COURT PROCEEDINGS

On January 14, 1987, a lawsuit was filed against Danville and its Commissioners alleging the nonpartisan, at-large, city-wide voting for commission members excluded black representation and diluted the black voting strength. On February 3, 1987, the parties in the Voting Rights Case filed a stipulation for a consent decree. The stipulation stated that in reaction to the litigation, a referendum on a change of a form of government had been set for April 7, 1987. The parties agreed to a new form of government, which would consist of a mayor, aldermen and department heads. The February 3, 1987, stipulation provided: (1) for three years after the first general election held under the new form of government, the Commissioners would continue in office as the administrators of various departments, which corresponded to their duties as Commissioners; (2) the administrators would not be members of the city council and would not have any legislative duties; (3) the administrators could only be removed for misfeasance or malfeasance; (4) an eight-member vote of the city council would be necessary to remove them; (5) salaries for the new positions were to be set by the current city counsel (Commissioners); and (6) the salaries could not be changed for four years.

Judge Harold Baker entered a consent decree, which incorporated the stipulation's language, on February 3, 1987. A supplemental consent decree was filed on February 9, 1987. On February 10, 1987, Judge Baker vacated the previously entered decrees and rescheduled a hearing on the proposed settlement. He also enjoined the election scheduled for February 24, 1987, in Danville. On February 12, 1987,

Thomas Mellen filed a motion to intervene in the Federal case. The substance of his objections was that the negotiation process engaged in by the Commissioners violated conflict-of-interest statutes and public policy. The Vermilion County State's Attorney, Craig DeArmond, was also made a party in the action.

On February 20, 1987, a second hearing on the settlement began. DeArmond was present at the hearing. James Craven, one of plaintiffs' attorneys, testified that he was the principal negotiator of the settlement. Craven stated the proposed decree provided the Commissioners would become department heads after the transition to the new form of government. The major concession the Voting Rights Case plaintiffs made in the negotiation process was the length of the Commissioners' term as department heads. The Voting Rights Case plaintiffs acquiesced partially in defendants' demand or a request for a transition term. Craven stated he did not know when the retention issue arose in the negotiations. The corporate counsel initiated a discussion on the transition period. They then talked about the length of the transition.

A dispute between the Voting Rights Case plaintiffs and the defendants developed over who should set the salaries for the new positions and the interpretation of the February 3, 1987, consent decree's language. Defendants' attorney stated that the present Commissioners would not set their salaries, they just would not reduce them. The February 20, 1987, hearing was continued until the dispute could be resolved.

A third hearing on the settlement of the Voting Rights Case occurred on February 25, 1987. At the hearing, defendants' attorney stated the agreement had been changed to provide for the removal of the department heads for misfeasance, malfeasance, or nonfeasance. Second, the settlement had been amended to provide the new mayor and aldermen could review salaries for the department heads but could not reduce them absent good faith.

Judge Baker stated that after a settlement was entered, he would dissolve the injunction against DeArmond, DeArmond would be free to pursue whatever paths he wished as a prosecutor, and the defendants would have to defend against the action.

Wendell Wright, corporate counsel for Danville, testified the Commissioners were aware of the Springfield voting rights lawsuit. They assumed similar factors applied in Danville. Two days after the resolution of the Springfield case, the Danville city council met and passed a resolution to place a referendum on the ballot in the April 1987 election about a change in government. If the referendum passed, the

new mayor-alderman government would begin in 1991. After the resolution passed, Wright talked to Craven. Craven indicated plaintiffs would not wait four years for the change in government and would seek an injunction prohibiting elections under the commission form of government. After the Commissioners decided to place the change in the form of government on the ballot, changing the form of government was not a matter of discussion.

The Commissioners wanted the election to take place and told Wright to continue negotiating but prepare for litigation. Wright stated he and plaintiffs' attorney discussed "quickly and fairly early" the present Commissioners continuing in office as department heads for a transition period. The Commissioners wanted the department-head positions to be elected on a city-wide basis. The Voting Rights Case plaintiffs said no election, but agreed to appointed positions.

Wright stated further the city and the Voting Rights Case plaintiffs reached an impasse. After Craven discussed a transition term with his clients, he offered a two-year transition, with the Commissioners becoming appointed department heads. Wright discussed this proposition with the Commissioners, who rejected the proposal because the transition time was too short. The Commissioners felt a total change in government form could not be made in two years. Subsequently, the voting rights plaintiffs agreed to a three-year holdover.

Wright stated further that he and the Commissioners in conjunction with the three-year package discussed the possibility of reprisals by the new aldermen. Therefore, the Commissioners wanted salary protection for the department heads and employees. This was a very important issue at the last meeting, but had been discussed before. The Commissioners asked Wright to tell Craven the three-year provision was acceptable, subject to a stipulation protecting department heads and their employees during the three-year period. Wright further testified his position as corporate counsel was not covered in the consent decree.

Wright stated the Commissioners did not discuss the time necessary for vesting of pensions while discussing the settlement. Salaries were not directly discussed during the negotiations.

At the conclusion of the hearing, Judge Baker entered a minute order. He found the plaintiffs had a reasonable likelihood of success on the merits. The Voting Rights Case plaintiffs and defendants had negotiated a settlement in light of the expense, divisiveness of litigation, and defendants' strong concern for an orderly transition. The court found defendants had articulated a reasonable basis for the three-year transition term and their retention in administrative capac-

ities. Judge Baker found the settlement did not violate Illinois conflict-of-interest statutes. He noted the Voting Rights Case was a complex and potentially expensive matter, where a settlement which included a transition period provided stability and continuity of government. Judge Baker noted the Commissioners did not violate their fiduciary duty to the City of Danville. Judge Baker dissolved the injunction preventing grand jury investigations. The grand jury met in conjunction with the instant case on March 23, 1987, July 13, 1987, and July 17, 1987.

## GRAND JURY PROCEEDINGS

Wendell Wright testified that a day or two after the Voting Rights Case was filed, he talked about settlements with plaintiffs' attorney. At that time, the Commissioners had no position regarding settlement. They had placed a question on the change of government on the April election ballot. Wright told plaintiffs' attorney the referendum should solve the problem. The change of government question had been placed on the ballot because Wright knew and advised the council that the commission form of government had not withstood attack in Springfield. The Commissioners' first position in negotiating was that the regular election should take place, the change of government question be voted on, and a four-year transition occur.

Once it was clear that the Voting Rights Case plaintiffs would seek an injunction to prevent elections under the commission form of government, the Commissioners took the position that the form of government would change but department heads, corresponding with the branches of government the Commissioners supervised, should be elected for a four-year term on a city-wide basis. The Voting Rights Case plaintiffs' position was that this still diluted black voting strength.

Therefore, the Commissioners authorized Wright to move to a four-year, appointed department-head position. The Voting Rights Case plaintiffs agreed to appointed department heads in exchange for a quick election under the new form of government. The Voting Rights Case plaintiffs were willing to have a two-year holdover of present Commissioners as department heads to facilitate the transition.

Wright testified further that he took this proposal back to the city council. They did not approve it. The Voting Rights Case plaintiffs proposed a three-year holdover to ensure a proper transition, with early elections. There was a general agreement that the Commissioners would become department heads. Wright stated nothing in the

Voting Rights Act required a retention of Commissioners in any form. The Commissioners could possibly have settled the case without retention. *Wright* did not think the elected Commissioners had a vested right or interest to continued employment after the change in the form of government. Had they failed to gain reelection, they would not have continued in any form of employment.

All Commissioners were running for reelection in 1987. Wright's first negotiating position on transition was that the Commissioners should stay in office for four years. The Commissioners felt that they were sacrificing their personal positions because all would have been reelected and stayed in office for four years, had the Voting Rights Case not started. After plaintiffs proposed a two-year transition, the Commissioners rejected it because the Commissioners felt they had made all of the concessions.

Ernie Cox, the commissioner of streets and public improvements, stated his current term ended in April 1987. He had been a commissioner for eight years and was running for reelection. The first issue resolved was the change in form of government. On February 3, 1987, the council passed Ordinance No. 7229, proposing a change in the form of government. The primary dispute from then on was retention of the current council in some capacity and the salary issue. The first proposal was for a full election. The second was for elected department-head positions. Then, the Voting Rights Case plaintiffs proposed a two-year retention as department heads. The current council turned it down because they wanted an election. Originally, the current council would set salaries for the department-head positions, then move into the position after the election of the new form of government. This position changed about a week before the final fairness hearing. The lawsuit would not have been settled absent resolution of the transition period and salary issues. As he understood the settlement, he was guaranteed a position as a department head for at least three years after the September general election.

At one point during the negotiations, the council discussed the qualifying time remaining before vesting of Scharlau's pension. However, the pension was not a reason for the retention period exceeding two years. The two-year transition period was insufficient time to transform government. The department heads were to retain the same salaries as the Commissioners unless the new council and mayor reduced it.

Jerome Brown testified he had been the health and safety commissioner for four years. His term would have expired in April 1987. At the outset, the city council determined that because of the similari-

ties between Danville and Springfield, the form of government would have to change. Brown wanted the scheduled elections to continue. He felt he would win reelection. Salaries were not discussed. Brown believed the salary question was undecided until the fairness hearing. The council discussed retention for transition in some form from the outset of negotiations. The amount of service time necessary to vest retirement benefits was brought up once. Cox and Randall had already qualified for retirement benefits. Scharlau, the acting mayor, needed 1½ years. Brown needed four years. Wright was present when the council discussed retirement.

Ray Randall stated he had been the commissioner of public property for 12 years. He was running unopposed for reelection in April 1987. Randall understood there was no legal requirement that Commissioners be retained in the new government. Salaries were the last item of negotiation. Randall originally thought the current council could not set the department-head salaries. However, he was told this was permissible. The salary problem was resolved at the last fairness hearing.

The council members mentioned pension rights but did not discuss them while discussing the settlement offers. He opposed the two-year proposal because he felt strongly the department-head positions should be elected. Randall agreed keeping a position after the change in government was a direct personal benefit.

Scharlau testified he was commissioner of accounts and finance and acting mayor for the City of Danville. Scharlau did not believe the council considered settling the suit, absent a transition with a carryover period. His eligibility for retirement had nothing to do with the length of transition. He did not intend to insure continuing employment for himself or for the other council members.

All of the Commissioners testified their principal concern was that an orderly transition occur. They felt settlement was best to preclude expense for the city and resolve the dispute.

ANALYSIS

Initially, defendants argue section 3—14—4(a) of the Municipal Code and section 3(a) of the Corrupt Practices Act do not apply to situations where the subject of a lawsuit against the city is the form of its government and its officials negotiate a settlement. Since these statutes do not apply, defendants contend they could not have been convicted of official misconduct based upon violations of these statutes. Under the facts presented in the instant case, we agree.

Section 3—14—4(a) of the Municipal Code states:

"No municipal officer shall be interested, directly or indirectly, in his own name or in the name of any other person, association, trust or ·corporation, in any contract, work or business of the municipality, or in the sale of any article, whenever the expense, price or consideration of the contract, work, business or sale is paid either from the treasury or by any assessment levied by any statute or ordinance." (Ill. Rev. Stat. 1987, ch. 24, par. 3—14—4(a).)

Section 3(a) of the Corrupt Practices Act states:

"No person holding any office, either by election or appointment under the laws or constitution of this state, may be in any manner interested, either directly or indirectly, in his own name or in the name of any other person, association, trust or corporation, in any contract or the performance of any work in the making or letting of which such officer may be called upon to act or vote." (Ill. Rev. Stat. 1987, ch. 102, par. 3(a).)

Section 33—3 of the Criminal Code of 1961 (Code) states in part:

"Official Misconduct. A public officer or employee commits misconduct when, in his official capacity, he commits any of the following acts:

(a) Intentionally or recklessly fails to perform any mandatory duty as required by law; or

(b) Knowingly performs an act which he knows he is forbidden by law to perform; or

(c) *With intent to obtain a personal advantage for himself or another, he performs an act in excess of his lawful authority.*" (Emphasis added.) Ill. Rev. Stat. 1987, ch. 38, par. 33—3.

 ██ The interpretation and construction of statutory provisions are governed by the principle that the legislature's intention shall be ascertained and given effect. (*Benjamin v. Cablevision Programming Investments* (1986), 114 Ill. 2d 150, 499 N.E.2d 1309; *People v. Savaiano* (1976), 66 Ill. 2d 7, 359 N.E.2d 475; *Edwards v. Sterling Drugs, Inc.* (1988), 167 Ill. App. 3d 181, 521 N.E.2d 296.) The entire statute, its nature, object, and purpose to be attained must be considered. (*Edwards*, 167 Ill. App. 3d 181, 521 N.E.2d 296.) In construing statutes, each word or provision will be given a reasonable meaning. Courts will not presume the statute contains surplus language. (*Bloese v. Board of Education of Community Unit School District No. 300* (1985), 138 Ill. App. 3d 460, 485 N.E.2d 1276.) Where the terms of a statute are not defined, they will be given their ordinary meaning, unless this would defeat the legislative intent. (*People v. Hicks* (1984), 101 Ill. 2d 366, 462 N.E.2d 473.) However, penal statutes will be

strictly construed. (*Midwest Television, Inc. v. Champaign-Urbana Communications, Inc.* (1976), 37 Ill. App. 3d 926, 347 N.E.2d 34.) Ambiguities in criminal statutes should be interpreted in favor of lenity. Thus, they are resolved in favor of the defendant. *People v. Alejos* (1983), 97 Ill. 2d 502, 455 N.E.2d 48; *People v. Haron* (1981), 85 Ill. 2d 261, 422 N.E.2d 627.

The language of section 3—14—4(a) states no officer shall be interested directly or indirectly in "any contract, work or business of the municipality" whenever the expense, price, or consideration of the contract, work or business or sale is paid from the treasury or by assessment. (Ill. Rev. Stat. 1987, ch. 24, par. 3—14—4(a).) Similarly, section 3(a) of the Corrupt Practices Act provides that no person holding office "may be in any manner interested, either directly or indirectly" in "any contract" upon which such officer may be called upon to act or vote. (Ill. Rev. Stat. 1987, ch. 102, par. 3(a).) Official misconduct as charged here occurs when a public officer or employee "with the intent to obtain a personal advantage" performs an act in excess of his lawful authority. The act alleged here is negotiating a settlement of the voting rights lawsuit which included a transition period.

A conviction of official misconduct as charged in section 33—3(c) of the Code (Ill. Rev. Stat. 1987, ch. 38, par. 33—3(c)) requires: (1) an act by a public officer or employee in his official capacity which exceeds his lawful authority and (2) an intent to obtain a personal advantage for himself or for another. (*People v. Sims* (1982), 108 Ill. App. 3d 648, 439 N.E.2d 518.) Knowledge that the officer is acting outside of his lawful authority is not an element. (*People v. Kleffman* (1980), 90 Ill. App. 3d 1, 412 N.E.2d 1057.) Official capacity means accomplishment by use of one's position as an officer or employee. (*People v. Steinmann* (1978), 57 Ill. App. 3d 887, 373 N.E.2d 757.) If a defendant performs an official act intending to obtain a personal advantage, and in doing so exceeds his authority, he commits official misconduct. See generally *People v. Mehelic* (1987), 152 Ill. App. 3d 843, 504 N.E.2d 1310.

A review of authorities addressing conflict of interest will be helpful. In *Brown v. Kirk* (1976), 64 Ill. 2d 144, 151, 355 N.E.2d 12, 16, the court noted that section 3(a) of the Corrupt Practices Act is addressed not only to the actual bad-faith abuse of power for an officer's personal benefit, but also is designed to prevent the creation of relationships which carry with them the potential for such abuse. The statute prevents the creation of such relationships by removing the temptation of becoming involved in them.

An illustrative case is *People v. Savaiano* (1976), 66 Ill. 2d 7, 359

N.E.2d 475. In *Savaiano*, the chairman of a finance committee and member of the county forest preserve commission participated in negotiations for the purchase of land by the county. The county eventually instituted eminent domain proceedings to acquire the property. However, Savaiano, while holding his public offices, also owned an interest in the property. Although the sale to the county was not completed, Savaiano sold his interest to a third party at a profit. He was convicted of having an interest in the contract as proscribed by the Corrupt Practices Act. The supreme court held the statute applied to self-dealing which occurred during the negotiation process. The supreme court found support for its conclusion in the high standard of conduct to which public officers are held. It noted the broad, sweeping language of the statute supported its conclusions as well.

In *People v. Simpkins* (1977), 45 Ill. App. 3d 202, 210, 359 N.E.2d 828, 833, the court held an indictment charging defendant with violations of the Municipal Code and Corrupt Practices Act due to his wife's employment by the city water department while he was mayor did not charge an offense. However, the court discussed the purpose of the conflict-of-interest statutes. It noted that the statutes express a strong public policy against self-dealing by public officials.

■ Thus, the language of the statutes and their purpose present a sweeping prohibition against public officials and officers engaging in conduct which divides their loyalty between their personal interests and their fiduciary duties. The Commissioners and the corporate counsel in the instant case had a personal interest in continued employment during the transition period which resulted from the negotiations. A personal interest includes an interest in continued employment or income. (*Mulligan v. Village of Bradley* (1985), 131 Ill. App. 3d 513, 475 N.E.2d 1029; *Robertson v. Binno* (1978), 56 Ill. App. 3d 390, 371 N.E.2d 681; *People v. Weber* (1985), 133 Ill. App. 3d 686, 479 N.E.2d 382.) Bad faith or intentional wrongdoing is not necessary to support a conviction under statutes prohibiting self-dealing. (See *Miller v. County of Lake* (1980), 79 Ill. 2d 481, 404 N.E.2d 222.) Therefore, defendants' arguments that they had good intentions and that their end result benefitted the city would not preclude conviction.

■ However, the express language of the statutes does not define the terms "interest" or "contract." They do not state that the personal interest must be wholly separate from the officer or employee's public duty or public interest. Nor, do the statutes address a mixed-interest case. Therefore, the statutes contain an inherent ambiguity in the present situation.

■ A review of the precedents presented to us and our research

have shown that Illinois cases addressing conflict of interest all deal with situations where the official's personal interest could be severed entirely from his official duties. (See generally *Savaiano*, 66 Ill. 2d 7, 359 N.E.2d 475; *Mulligan*, 131 Ill. App. 3d 513, 475 N.E.2d 1029.) Additionally, the personal interest resulted from a factor wholly within the control of the official. Here, the defendants had a duty to resolve the Voting Rights Case in the best manner for the citizens of Danville. None of the parties question the advisability of a transitional period, which would bridge the uncertainty created by a total change in the form of government. The Voting Rights Case also presented a direct challenge to the Commissioners' continuation in office and thus directly impacted a personal interest in continued employment. The fiduciary duty of the defendants and any personal interest, thus, were inextricably linked together by the situation presented to them. We know of no fashion in which the defendants could have negotiated the best settlement for the City and have avoided any discussion of transitional governments where personal interests would be impacted. Therefore, in a mixed-interest situation such as that presented in the instant case, the conflict-of-interest statutes are not violated by negotiating a settlement which includes an incidental personal benefit. Settlement of the lawsuit was within the scope of the defendants' public duties, their actions were open to public scrutiny, and no practical manner existed for the defendants to remove themselves from the negotiation and settlement process. Additional support for our position is found in *Savaiano*, wherein the supreme court stated:

"[H]is activities *** through his agent and associates were not conclusively within his official duties as a member of a legislative body." (*Savaiano*, 66 Ill. 2d at 18, 359 N.E.2d at 481.)

Here, all of the activities of defendant Commissioners were within their official duties as members of a legislative body.

Significant also is the fact that the settlement was tentative until its approval by the Federal court. Here, all parties recognize that the Federal court could have rejected the settlement with its transition period. Federal courts have been admonished to refuse approval when State laws are violated during the settlement process or by the settlement itself. (*Derrickson v. City of Danville* (7th Cir. 1988), 845 F.2d 715.) In *Derrickson*, the Federal court held the consent hearings involved in the instant case did not preclude the instant State criminal proceedings, because the State's Attorney was not given a full opportunity to address the issue in Federal court. The *Derrickson* court noted Federal courts should not approve settlements which were reached in violation of State law. Here, we find the Illinois conflict-of-

interest statutes were not violated.

Because of our resolution of defendants' first contention, the other issues they raise need not be addressed.

For the above reasons, we reverse the trial court.

Reversed.

KNECHT, P.J., and STEIGMANN, J., concur.