**Wendell WRIGHT, Raymond T. Randall, Ernie Cox, and Jerome D. Brown, Petitioners–Appellants,**

v.

**Craig DeARMOND, Sued as State's Attorney of Vermillion County, Roland Burris, Sued as Attorney General of the State of Illinois, Paul C. Komada, Sued as Circuit Judge of the Fifth Judicial Circuit of Illinois, et al., Respondents–Appellees.**

Nos. 91–3375, 91–3376, 91–3377 and 91–3378.

United States Court of Appeals, Seventh Circuit.

Argued May 19, 1992.

Decided Oct. 9, 1992.

Rehearing and Rehearing En Banc Denied Nov. 30, 1992.

---

Matthias A. Lydon (argued), Jayne Carr Thompson, Lydon & Griffin, Chicago, Ill., Everett Laury, Hutton, Laury, Hesser & Lietz, M. Eugene Wright, Wright Law Offices, Danville, Ill., for petitioners-appellants.

Craig DeArmond (argued), pro se.

Roland W. Burris, pro se.

Douglas K. Smith, Asst. Atty. Gen., Office of Atty. Gen., Criminal Appeals Div., Springfield, Ill., for respondents-appellees Roland W. Burris and Paul C. Komada.

Craig H. DeArmond, States Atty. Vermilion County, Danville, Ill., for respondent-appellee Vermilion County, Ill.

Before BAUER, Chief Judge, RIPPLE, Circuit Judge, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

The City of Danville, Illinois, and its Commissioners were named defendants in a voting rights suit brought by a group of minority Danville citizens. In the process of settling this suit, the Commissioners secured personal benefits. The Commissioners and the Danville Corporation Counsel were later convicted of conspiracy to violate state and local conflict-of-interest laws. The convictions were reversed by the Illinois Appellate Court but reinstated by the Illinois Supreme Court. The Commissioners and Corporation Counsel then sought a writ of habeas corpus in the federal district

court, alleging that the state criminal prosecution violated their First Amendment right to petition the court for a redress of their grievances. The district court denied the writ. We affirm.

## I

## BACKGROUND

### A. *Facts*

The facts of this case have previously been reported in several opinions. *See Derrickson v. City of Danville, Ill.*, 845 F.2d 715 (7th Cir.1988); *People v. Scharlau*, 141 Ill.2d 180, 152 Ill.Dec. 401, 565 N.E.2d 1319 (1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991); *People v. Scharlau*, 193 Ill.App.3d 280, 140 Ill.Dec. 260, 549 N.E.2d 911 (1990). Therefore, we present here only those facts necessary for the resolution of this appeal. Under the mandate of 28 U.S.C. § 2254(d), "state court factual findings that are reasonably based on the record are accorded a presumption of correctness." *Bryan v. Warden, Indiana State Reformatory*, 820 F.2d 217, 218–19 (7th Cir.), *cert. denied,* 484 U.S. 867, 108 S.Ct. 190, 98 L.Ed.2d 142 (1987). The petitioners do not dispute these factual findings. Appellants' Br. at 1.

In January 1987, Raymond T. Randall, Ernie Cox, and Jerome D. Brown were each nearing the end of their four-year terms as Commissioners of the City of Danville, Illinois. Each Commissioner anticipated running for re-election the following month. On January 14, 1987, a group of black residents filed a class action under the Voting Rights Act against the City and its Commissioners, alleging that the City's nonpartisan, at-large process for electing Commissioners excluded black representation and diluted their voting strength. The case was assigned to Chief United States District Judge Harold Baker. Two days earlier, Chief Judge Baker had ruled in a separate case that the same commissioner-at-large form of government in Springfield, Illinois (which had demographic similarities to Danville at the time), violated the Voting Rights Act. *See McNeil v. City of Spring-field, Ill.*, 658 F.Supp. 1015 (C.D.Ill.1987), *appeal dismissed,* 818 F.2d 565 (7th Cir. 1987). As Corporation Counsel of the City of Danville, Wendell Wright advised the Danville Commissioners of the result of the Springfield litigation and the cost to the City of Springfield of pursuing that litigation—in excess of $500,000. The petitioners determined that they and the City could not hope to prevail in the litigation. In response, on January 15, 1987, the Commissioners placed on the April election ballot a referendum to change the form of city government to a more representative aldermanic system, to take effect in 1991. This referendum was communicated to the attorney representing the civil rights plaintiffs as a possible settlement of the lawsuit. The plaintiffs indicated that they would not wait four years for a change in government and would seek an injunction prohibiting elections under the Mayor–Commissioner form of government.

Over the next two and one-half weeks, the Commissioners negotiated a settlement with the class plaintiffs. The Danville City Commission approved and enacted the settlement as City Ordinance # 7229. On February 3, the Commissioners filed with the district court a stipulation for a consent decree. The stipulation provided that Danville's form of government would change from a Mayor–Commissioner system to a Mayor–Alderman system. The stipulation also provided that: (1) for three years after the first general election under the new government, the Commissioners would continue in office as the Administrators of the various departments which corresponded to their commission duties; (2) the occupants of these administrative, or "department head," positions would not be members of the city council and would have no legislative duties; (3) the Administrators could be removed only by a majority vote of the city council, and only for "misfeasance or malfeasance;" and (4) the current Commissioners would determine the salaries for the new Administrators, and these salaries would not change for four years. The same day, February 3, 1987, the district court entered a consent decree which incorporated the stipulation's language. A sup-

plemental consent decree was filed on February 9.

Craig DeArmond, State's Attorney for Vermillion County, began a criminal investigation into whether the petitioners violated state and local conflict-of-interest laws in negotiating on behalf of the City to obtain jobs for themselves. The parties asked the district court to add the State's Attorney as a party to the federal case and enjoin the investigation. The court did so and also enjoined the Danville election scheduled for February 24, 1987. At hearings on February 20 and 25, 1987, the district court heard evidence on the substance and process of the settlement negotiations. The State's Attorney argued throughout the hearings that the petitioners violated Illinois conflict-of-interest laws. However, the district judge repeatedly warned the State's Attorney that the court would not allow him to argue the merits of such claims, and indicated several times that the State would have the opportunity to pursue the prosecution of the petitioners after a settlement was entered. At the conclusion of the hearings, however, the district court not only approved the consent decree, it expressed general approval to the process that led to it:

> [D]efendants, aside from avoiding years of turmoil, have saved the city the crippling expense of the litigation and diminished the costs of salaries for the administrative officers.... The defendants did not violate their fiduciary relationship to the city or secure a personal advantage in conflict with their duty to serve the city. They made a sensible and reasonable settlement of a difficult lawsuit. Finally, the defendants had very little likelihood of success in the litigation considering the facts of the case presented at the hearing for approval of the settlement....
>
> I conclude that the purposes of the Voting Rights Act to remedy loss of voting rights by minorities is furthered by settlements such as this. If the Illinois statutes are in conflict with the settlement, and I conclude they are not, then the state statutes should give way to the policy of the federal law. I conclude that

the proposed decree is fair, adequate, and reasonable and that it does not violate state or federal law.

*Derrickson v. City of Danville, Ill.*, Minute Order at 6–7 (Appellant's Br., App. C) (C.D.Ill. Feb. 27, 1987).

Soon thereafter, the State's Attorney resumed his investigation and convened a Vermillion County grand jury. On July 17, 1987, the grand jury returned an indictment against the Commissioners and Mr. Wright for violating state and local conflict-of-interest laws. The Commissioners and Mr. Wright returned to federal district court and petitioned the court to enjoin the state criminal prosecution in order to "effectuate" its judgment in the Voting Rights Act case. On August 27, 1987, the district court granted the petition and enjoined the state prosecution. The State appealed to this court and, on April 28, 1988, we reversed the judgment of the district court and dissolved the injunction. We held that the State's Attorney was not bound by issue or claim preclusion for two reasons:

> (1) the district court severely limited the State's Attorney's participation in the case, and (2) the court needed to, and did, decide only whether the Danville government as an entity had the power to *enter into* the decree; it did not need to, and did not, decide whether the Commissioners were the right parties to *negotiate* on behalf of the City with themselves as jobseekers.

*Derrickson v. City of Danville, Ill.*, 845 F.2d 715, 721 (7th Cir.1988) (emphasis in original). We concluded that there was no basis to enjoin the state prosecution either because the district court never meant to approve of the manner of negotiation (as opposed to its substance and binding quality) or because, if it did, it did not offer the State's Attorney a full and fair opportunity to litigate the subject. *Id.* at 723. The state prosecution resumed and, on December 12, 1988, a superseding indictment was filed with the state court. The case proceeded to trial before Judge Paul C. Komada presiding without a jury. On February 15, 1989, the state court entered findings of

fact and a judgment of guilt as to the petitioners. The court found that the petitioners "chose a 'manner of negotiation' that resulted in the commissioners receiving a personal pecuniary benefit to which they were not lawfully entitled.... The 'manner of negotiation' was not in accord with Illinois law." Findings of the Court, Feb. 15, 1989, at 4–5. On April 7, 1987, the state court sentenced each of the commissioner-defendants to two years conditional discharge and a fine of $1,000. The court sentenced Mr. Wright to two years conditional discharge, a fine of $5,000, and ninety days in jail.

The Illinois Appellate Court reversed the convictions on the ground that the conflict-of-interest provisions were not applicable to the defendants' actions. The court reasoned that the provisions, as construed by Illinois courts, apply to situations where an official's personal interest is separate and severable from the official's public duties, and that the provisions were not designed for cases of mixed interests. The court determined that the fiduciary duty that the defendants owed the City and any personal interest in the settlement were "inextricably linked together by the situation presented to them." *People v. Scharlau*, 193 Ill.App.3d 280, 140 Ill.Dec. 260, 549 N.E.2d 911, 919 (Ill.App.Ct.), *rev'd*, 141 Ill.2d 180, 152 Ill.Dec. 401, 565 N.E.2d 1319 (1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991). The court concluded that,

> in a mixed-interest situation such as that presented in the instant case, the conflict-of-interest statutes are not violated by negotiating a settlement which includes an incidental personal benefit. Settlement of the lawsuit was within the scope of the defendants' public duties ... and no practical manner existed for the defendants to remove themselves from the negotiation and settlement process.

*Id.*

The Illinois Supreme Court reversed the appellate court and reinstated the convictions. Section 33–3(c) of the Illinois Criminal Code, noted the court, simply states that a public officer commits misconduct when that official performs an act "in ex-

cess of his lawful authority" to "obtain a personal advantage for himself." *People v. Scharlau*, 141 Ill.2d 180, 152 Ill.Dec. 401, 410, 565 N.E.2d 1319, 1328 (Ill.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991); Ill.Rev.Stat. ch. 38, ¶ 33–3 (1987). The supreme court disagreed with the appellate court's conclusion that the defendants acted within the scope of their authority:

> We agree that defendants' settling the lawsuit was within their lawful authority. We find, however, that defendants' arranging for their own employment for a fixed term and salary was outside that authority.... The lawsuit ... could have been settled without defendants' receiving a three-year employment contract. It was obvious to defendants that there was no hope that they would prevail in the litigation.... [T]he voting rights suit guaranteed that defendants' positions would cease to exist. We can see no way to construe the lawful authority of the former Danville city commissioners to include the preservation of their jobs when the existing governmental structure violated the civil rights of the city's citizens....

*Scharlau*, 152 Ill.Dec. at 408–09, 565 N.E.2d at 1326–27. The court acknowledged that the defendants' concern for some sort of transitional government was legitimate, but objected to "the defendant's methods and the ultimate personal reward they gleaned from the establishment of [the] transition government." *Id.* The supreme court also found that the benefit received by the Commissioners was more than incidental: "Defendants were faced with unemployment. An agreement which guaranteed them a three-year extension of their positions while giving them the power to set and fix their own salaries for four years is anything but 'incidental' in light of this." *Id.* 152 Ill.Dec. at 410, 565 N.E.2d at 1328. The court denied rehearing without comment, and the Supreme Court of the United States denied certiorari.

### B. *District Court Proceedings*

The Commissioners then petitioned the federal district court for a writ of habeas

corpus on the ground that the Illinois criminal prosecution violated their First Amendment right to petition the federal courts for a redress of their grievances. The district court first addressed the question of exhaustion and procedural default and held that the First Amendment challenge was "fairly (minimally so) presented to the Illinois courts." *Order of Sept. 13, 1991*, (R.18) at 2, 23. After reviewing the background of the case, the court considered the petitioners' argument that the First Amendment protects their rights to litigate their own interests in court against any state interference. The court reasoned that this principle was not controlling because, in the voting rights case, the petitioners were supposed to be litigating their official interests:

> [T]he fiduciary duty which Illinois imposes on its public officials does not prevent them from litigating their own rights or interests in court. It only requires that public officials keep their own interests separate from those of their constituents. Though the Petitioners were the named defendants in the voting rights lawsuit, that lawsuit was not about their *personal* interests. Rather, it was about their *official* interests.... The Petitioners may have had the right to come to court and argue that they had a protectible interest in being retained in unelected positions at a fixed salary ... but the question remains whether they had a right to protect this "interest" in the way they did—as part of the voting rights suit which they were negotiating on behalf of the city as a whole.

*Id.* at 25 (emphasis in original).

The court also addressed the petitioners' comparison of themselves with the parties in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), in which the Supreme Court held that the antitrust laws could not be used to punish or prevent concerted efforts to persuade government officials to impose a restraint on trade. Again, the court distinguished the personal and official interests of the Commissioners:

> Of course, the conflict of interest laws would not prevent the petition[ers] from voicing their personal concerns to the government in any context in which their fiduciary duty to the city had not attached. The statutes did, however, prevent them from voicing concerns about their personal interests in the voting rights case....
>
> ....
>
> It would be incredible for this Court to hold that the Petitioners had a *personal* interest in preserving a voting system that was unconstitutional, ... and the Petitioners do not claim any such interest here.... The Petitioners have maintained in this court that their only interest was in assuring a "smooth transition" to the city's new aldermanic form of government.

R.18 at 29 (emphasis in original). The court isolated the petitioners' personal interest as the interest in seeing that they were the persons to fill the new government positions. The court noted that the conflict-of-interest statute did not prevent them from pursuing this interest through governmental means, only from pursuing it as public officials:

> The Petitioners may then be saying that they had a right to suggest to the court that a smooth transition could only occur if they personally filled government positions under the new aldermanic positions. This is unacceptable. Illinois would not and could not have sanctioned them for making this proposal [in their individual capacity] to the new board of aldermen. Once out of office, each could still exercise his constitutional right to voice to the government his opinion that he was the best man for the job. The conflict of interest statutes only prevented them from making that self-serving proposal *for* the city, not *to* the city.

*Id.* at 30 (emphasis in original). For these reasons, the district court concluded that Illinois' conflict-of-interest laws, as applied, had no significant effect on petitioners' First Amendment rights to voice personal

concerns in their personal capacity. Alternatively, the court reasoned that the *Noerr–Pennington* doctrine does not apply to the petitioners because "they knew they could not prevail in litigation, yet refused to submit a settlement to the federal court until their own interests were adequately protected." R.18 at 29. In the district court's view, this made the petitioners analogous to parties that have been denied, under the "baseless litigation" exception, the benefit of *Noerr–Pennington*.

## II

## ANALYSIS

On appeal, petitioners renew their First Amendment challenge to the state conflict-of-interest provisions.[1] The petitioners submit that the respondents "have interpreted Illinois law and applied it to petitioners so as to deny them access to the federal court to freely express their ideas, in violation of the Petition Clause of the First Amendment of the Constitution of the United States." R.1 at 9.

■ In evaluating the submission of the petitioners, we believe that it is important to delineate, at the outset and with some precision, the conduct for which the petitioners were prosecuted by state authorities. On this point, we are bound, of course, by the pronouncement of the state courts. A review of the opinion of the Illinois Supreme Court makes clear that the petitioners were prosecuted because they participated in the negotiation of a settlement agreement which involved not only matters within their public responsibility but also involved their private employment interests. Wrote Justice Stamos for the court:

> Defendants had a duty to act in the best interests of the city. They also had a duty to refrain from using their positions as city commissioners for personal benefit. We agree that defendants' settling the lawsuit was within their lawful authority. We find, however, that defendants' arranging for their own employ-

ment for a fixed term and salary was outside that authority. Public officials are expected to adhere to the highest standards of ethical conduct.... The lawsuit in the case at bar could have been settled without defendants' receiving a three-year employment contract. It was obvious to defendants that there was no hope that they would prevail in the litigation. There was no guarantee that, absent the lawsuit, any defendant would have been reelected anyway. However, the voting rights suit guaranteed that defendants' positions would cease to exist. We can see no way to construe the lawful authority of the former Danville city commissioners to include the preservation of their jobs when the existing governmental structure violated the civil rights of the city's citizens and the citizenry could not have returned defendants to their offices in an election because the commission form of government would cease to exist. Of course, defendants instead could have run for mayor or alderman in the new city government.

*People v. Scharlau*, 141 Ill.2d 180, 152 Ill.Dec. 401, 408–09, 565 N.E.2d 1319, 1326–27 (Ill.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991). We agree with the district court that, "[g]iven the holding of the Illinois Supreme Court, it must be taken as settled that a city official violates the Illinois conflict-of-interest statutes by agreeing to submit on behalf of the city a proposed consent decree to a federal court when the decree, if accepted would give the official a personal interest." R.18 at 24. We believe that the conduct described by the Illinois Supreme Court, and summarized by our colleague in the district court, does not implicate the Petition Clause.

### 1.

The Petition Clause of the First Amendment, applicable to the states by virtue of the Fourteenth Amendment's Due Process

---

1. The respondents claim that this issue was not fairly presented to the state courts. After careful examination of the record submitted to us

on appeal, we believe that the district court was correct in its determination that the fair presentment requirement was met.

Clause, *see Edwards v. South Carolina,* 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963), is "cut from the same cloth as the other guarantees of that Amendment, and is an assurance of a particular freedom of expression." *McDonald v. Smith,* 472 U.S. 479, 482, 105 S.Ct. 2787, 2789, 86 L.Ed.2d 384 (1985). It is designed to guarantee that persons " 'may communicate their will' through direct petitions to the legislature and government officials." *Id.* (quoting 1 Annals. of Cong. 738 (1789)). Like other aspects of freedom of expression, it never has been considered an absolute right but, rather, has been considered subject to reasonable limitations in the face of very important government interests. *See, e.g., Id.* at 485, 105 S.Ct. at 2791 (Petition Clause does not provide absolute immunity to defendants charged with expressing libelous and damaging falsehoods in petition to government officials); *Edwards,* 372 U.S. at 236, 83 S.Ct. at 684 (noting that right of petition and assembly can be subject to evenhanded application of a precise and narrowly drawn regulatory statute proscribing specific conduct); *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (same). Here, in its conflict-of-interest statutes, Illinois has addressed a problem of compelling importance to its capacity to govern justly: preventing political corruption or the appearance of corruption. *See Austin v. Michigan State Chamber of Commerce,* 494 U.S. 652, 658–60, 110 S.Ct. 1391, 1397–98, 108 L.Ed.2d 652 (1990); *FEC v. National Conservative Political Action Committee,* 470 U.S. 480, 496, 105 S.Ct. 1459, 1468, 84 L.Ed.2d 455 (1985); *Buckley v. Valeo,* 424 U.S. 1, 25–29, 96 S.Ct. 612, 637–40, 46 L.Ed.2d 659 (1976). The statute at issue addresses the particular problem of public officials achieving private goals through their official actions. It sets forth a simple, direct solution: public officials may not negotiate on behalf of the government when they would also be negotiating on behalf of themselves.

At the outset, it is important to note that the statute does not really restrict the individual government official's right to petition the government with respect to his personal interests. It merely requires that he not do so while representing simultaneously the official interest of the government. In making this distinction, the Illinois legislature recognized that, at all times, public officials are both public persons and private citizens. We often refer to these separate personae as their "official capacity" and their "individual capacity" or "private capacity." We refer to their corresponding interests in these capacities as "official interests" or "public interests," as compared with "individual interests" or "private interests." In the Voting Rights Act action, the petitioners appeared as parties by virtue of their official positions and attendant responsibilities in the Danville city government. They did not appear to assert individual or private interests. However, Illinois' conflict-of-interest statute required that, because the lawsuit necessarily implicated the petitioners' personal interests as well as their private interests, it was incumbent upon them not to participate in the settlement negotiations. *See Scharlau,* 152 Ill.Dec. at 409, 565 N.E.2d at 1327. No law prevented the petitioners from petitioning the government with respect to their own needs; they only were forbidden from doing so while representing official interests. As the district court noted:

> The difficulty with the Petitioners' reliance on [the Petition Clause] is that the fiduciary duty which Illinois imposes on its public officials does not prevent them from litigating their own rights or interests in court. It only requires that public officials keep their own interests separate from those of their constituents. Though the Petitioners were the named defendants in the voting rights lawsuit, that lawsuit was not about their *personal* interests. Rather, it was about their *official* interests. It was about whether the city's at-large voting system unconstitutionally diluted the voting strength of the minority citizens. The Petitioners may have had the right to come to court and argue that they had a protectible interest in being retained in unelected positions at a fixed salary (although the Petitioners all admitted that they were

not legally entitled to retention, *see Scharlau,* 141 Ill.2d at 180, 187, [152 Ill.Dec. at 404] 565 N.E.2d at 1322[ ) ], but the question remains whether they had a right to protect this "interest" in the way they did—as part of the voting rights suit which they were negotiating on behalf of the city as a whole.

R.18 at 25 (emphasis in original).

### 2.

 As noted, the First Amendment right to petition the courts is not absolute: it does not extend a right to use the courts for fraudulent or unlawful purposes. As the Ninth Circuit noted in *Mayer v. Wedgewood Neighborhood Coalition,* 707 F.2d 1020, 1023 (9th Cir.1983): "While normally protected by the first amendment, the invocation of administrative or judicial proceedings may be tortious and actionable if employed for a purpose that is unlawful and is other than and in addition to the goal sought openly in the proceeding itself." Believing their situation within an exception to this rule, petitioners draw analogy to corporations that petition courts for anticompetitive purposes and are excepted from the operation of the antitrust laws under the doctrine set forth by the Supreme Court in *Eastern Railroad Presidents Conference v. Noerr,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). However, as the Supreme Court made clear in *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the *Noerr–Pennington* doctrine does not exempt from the antitrust laws fraudulent appeals to judicial, administrative, or legislative bodies. The petitioners in *California Motor Transport* instituted state and federal proceedings to resist and defeat applications by competitors in the trucking business to acquire operating rights or to transfer or register those rights. 404 U.S. at 509, 92 S.Ct. at 611. In defense of antitrust claims, they appealed to the shelter of the *Noerr–Pennington* doctrine. The Supreme Court rejected this appeal on the ground that *Noerr–Pennington* does not protect fraudulent or "sham" litigation:

[U]nethical conduct in the setting of the adjudicatory process often results in sanctions. Perjury of witnesses is one example. Use of a patent obtained by fraud to exclude a competitor from the market ... [c]onspiracy with a licensing authority to eliminate a competitor ... bribery of a public purchasing agent....

There are many other forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations. Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process.... Insofar as the administrative or judicial processes are involved, actions of that kind cannot acquire immunity by seeking refuge under the umbrella of "political expression."

404 U.S. at 512–13, 92 S.Ct. at 613. The Court drew support from the general principle that the First Amendment does not prohibit criminal prosecution of all conduct that involves speech. The Court noted that it had stated this principle before, in *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949), when it upheld a Missouri statute banning secondary boycotts.

It is true that the agreements and course of conduct here were as in most instances brought about through speaking or writing. But it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.... Such an expansive interpretation of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society.

*California Motor Transport,* 404 U.S. at 514, 92 S.Ct. at 613 (quoting *Giboney,* 336 U.S. at 502, 69 S.Ct. at 690). The *California Motor Transport* Court concluded that

"First Amendment rights may not be used as the means or the pretext for achieving 'substantial evils' which the legislature has the power to control." 404 U.S. at 515, 92 S.Ct. at 614 (quoting *NAACP v. Button*, 371 U.S. 415, 444, 83 S.Ct. 328, 343, 9 L.Ed.2d 405 (1963).

Also illustrative of this principle is *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983), in which the Supreme Court stated that, under the Petition Clause of the First Amendment, a restaurant had the right to bring suit against its employees without the interference of the NLRB, but only if the suit was well-founded.

> The filing and prosecution of a well-founded lawsuit may not be enjoined as an unfair labor practice.... [But] the same is not true of suits based on insubstantial claims—suits that lack, to use the term coined by the Board, a "reasonable basis." Such suits are not within the scope of First Amendment protection.... Just as false statements are not immunized by the First Amendment right to freedom of speech, baseless litigation is not immunized by the First Amendment right to petition.

461 U.S. at 743, 103 S.Ct. at 2170 (citations omitted). *See also McDonald v. Smith*, 472 U.S. 479, 484, 105 S.Ct. 2787, 2791, 86 L.Ed.2d 384 (1985) ("[P]etitions to the President that contain intentional and reckless falsehoods 'do not enjoy constitutional protection,' and may ... be reached by the law of libel." (citations omitted)).

The district court concluded that petitioners' situation is more analogous to the "sham" litigation exception to the *Noerr–Pennington* doctrine than to the general rule set forth in those cases. The voting rights plaintiffs brought suit against the Commissioners in their official capacity, and the Commissioners participated as Danville city officials in defending the suit. According to the facts found by the Illinois courts, in light of the result in the Springfield litigation and the similarities between Springfield and Danville, Danville had no hope of successfully defending against the suit. *People v. Scharlau*, 141 Ill.2d 180, 152 Ill.Dec. 401, 403, 565 N.E.2d 1319, 1321 (1990) ("The hearings revealed that defendants knew that they could not hope to prevail in the litigation."), *cert. denied*, —— U.S. ——, 111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991). As representatives of the City of Danville, the petitioners enjoyed a certain leverage in the settlement negotiations, especially in light of the voting rights plaintiff's desire for immediate change. The petitioners legitimately sought to use this leverage to obtain from the plaintiffs concessions that would allow for smooth transition from the Mayor–Commissioners system to the Mayor–Aldermen system. However, the petitioners also sought to use this leverage, which was a product of their official status as defendants in the voting rights suit, to obtain personal benefits—placement of themselves in the transition jobs, the ability to set their own salary, political insulation, etc. To the extent that their petition to the court was a petition for approval of this illegal and fraudulent act—and it is only to this extent that the Illinois conflict-of-interest laws applied—it was "unethical conduct in the setting of the adjudicatory process," analytically analogous to the sort of conduct held to be unprotected by the First Amendment in *California Motor Transport*, 404 U.S. at 512, 92 S.Ct. at 612. Thus, the district court was correct to conclude that the petitioners' situation is more closely analogous to the "sham" litigation exception, rather than the rule, of the *Noerr–Pennington* doctrine.

Moreover, the policy concern that animates the *Noerr–Pennington* doctrine is not present in this case. As the Court emphasized in *Noerr*, the doctrine is grounded in the concern that applying the antitrust laws to attempts to influence governmental action would deprive business entities of an opportunity to participate in a legitimate effort to obtain a favorable change in the law from those governmental bodies with the authority to make such changes. *See Noerr*, 365 U.S. at 136–140, 81 S.Ct. at 529–31. As we have noted earlier, Illinois law hardly works such a deprivation on its public officials. They are free to pursue their personal goals by

petitioning the government. They simply may not do so while simultaneously representing the interest of the government.

## Conclusion

The role of the federal court on habeas review is limited. As the district court noted, it is not our place to determine the wisdom of Illinois' conflict-of-interest statutes. Nor is it our place to pass on the wisdom of its prosecutorial officials. Our only task is to determine whether the petitioners have been denied a federal constitutional right. Accepting our mandate and its limitations, we affirm the judgment of the district court denying the petition for writ of habeas corpus.

AFFIRMED.

BAUER, Chief Judge, dissenting.

I respectfully dissent. The gist of the criminal action, the demonstration that the state offers in prosecuting this conflict of interest charge, is that the litigation was "sham." Indeed, this allegation was the predicate for the denial of the motion to dismiss, for denying the motion for a directed verdict, the denial of the motion for J.N.O.V., and the district court's denial of relief in the instant case. The majority opinion finds this to be a fact as well.

The majority cites the Supreme Court of Illinois for that proposition: "According to the facts found by the Illinois courts, in light of the result in the Springfield litigation and the similarities between Springfield and Danville, Danville had no hope of successfully defending against this suit. *People v. Scharlau,* 141 Ill.2d 180, 152 Ill.Dec. 401, 403, 565 N.E.2d 1319, 1321 (1990) ("The hearings revealed that defendants knew that they could not hope to prevail in the litigation."), *cert. denied,* [— U.S. ——] 111 S.Ct. 2892 [115 L.Ed.2d 1057] (1991)."

That, as I see it, is the basis for the mens rea, the reason why the defendants are criminally liable for forging (and forcing) a settlement that benefits them in a case in which they were sure losers. Absent *that* fact, the defendants simply entered into a settlement agreement that was subject to judicial approval and appellate review. The state was a party to the proceedings leading to the settlement and could very well have availed themselves of the appellate courts to overturn the settlement. They chose instead to indict.

And that, it seems to me, is an abuse of discretion *and* an abuse of the Grand Jury process.

Let me begin with an observation from the record: if this case was an absolute dead-bang loser—lacking in any merit that would make a settlement offer either attractive or intelligent—then that fact certainly seems to have escaped the attention of the learned trial judge who approved the settlement. And *that* trial judge was the *very* trial judge who fashioned the relief in the Springfield case—that supposedly laid the issues in the Danville case completely to rest. Instead of pooh-poohing the settlement proposal (and entering summary judgment for the plaintiffs!) this is what Judge Harold Baker said:

[D]efendants, aside from avoiding years of turmoil, have saved the city the crippling expense of the litigation and diminished the costs of salaries for the administrative officers.... The defendants did not violate their fiduciary relationship to the city or secure a personal advantage in conflict with their duty to serve the city. They made a sensible and reasonable settlement of a difficult lawsuit. Finally, the defendants had very little likelihood of success in the litigation considering the facts of the case presented at the hearing for approval of the settlement....

I conclude that the purposes of the Voting Rights Act to remedy loss of voting rights by minorities is furthered by settlements such as this. If the Illinois statutes are in conflict with the settlement, and I conclude they are not, then the state statutes should give way to the policy of the federal law. I conclude that the proposed decree is fair, adequate, and reasonable and that it does not violate state or federal law.

**350**

*Derrickson v. City of Danville, Ill.,* Minute Order at 6–7 (Appellant's Br., App. C) (C.D.Ill., Feb. 27, 1987).

On the basis of that finding by an impartial judge who *approved* the settlement found to be a crime, I would like to ask how these defendants were to know that what they were up to was wrong—not just morally but criminally.

Everything the petitioners did in defending, negotiating and disclosing to the court what was plainly described by the terms of the settlement agreement was open to the glare of publicity. Unless we consider private communications with attorneys representing the parties to be underhanded, sneaky events, then everything and every motive of the petitioners was fully disclosed. Hardly the stuff that would merit a suggestion that the parties indulged in secret self-serving dealings and deceptions. If the proposal smacked of a crime, surely the judge who approved it would have given some indication of dismay.

It goes without saying that criminal laws cannot be broken by accident. And if reasonable people cannot rely on a pronouncement of a federal court that a proposed settlement is not only proper but "a sensible and reasonable settlement of a difficult lawsuit" and further, that it (the proposed settlement) "is fair, adequate, and reasonable and that it does not violate state or federal law," then no one in his right mind would ever propose to settle a case involving a government agency. As a matter of fact, after reading over the facts in this case, I would wonder that anyone in his or her right mind would ever seek public office.

Unless Judge Baker was an unindicted co-conspirator, I would take him at his word. No one knew the Springfield or Danville cases better than he. And he found no evidence of a violation of any law and said so. I believe that these defendants were denied equal protection of the law. There was no reason, other than a general distrust of public officials, to believe that they knowingly violated a single law—state or federal.

Nor do I believe, on the record before us, that the petitioners have waived any rights guaranteed by the Constitution, not the First Amendment, the Fourteenth Amendment or any other protection afforded us all by that document. And, even if I did perceive a waiver, I would find the denial of the motion to dismiss the indictment or to direct a verdict in favor of the petitioners to be plain error.

I would reverse the denial of the writ of habeas corpus and direct that the petitioners be discharged.